**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

          v.

DAVID ROLAND HINKSON,
              *Defendant-Appellant.*

No. 05-30303

D.C. No.
CR-04-00127-RCT

OPINION

Appeal from the United States District Court
for the District of Idaho
Richard C. Tallman, Circuit Judge, Presiding

Argued and Submitted
December 16, 2008—Pasadena, California

Filed November 5, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
Kim McLane Wardlaw, William A. Fletcher,
Richard A. Paez, Consuelo M. Callahan, Carlos T. Bea,
Sandra S. Ikuta and N. Randy Smith, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge W. Fletcher

14951

**COUNSEL**

Dennis P. Riordan and Donald M. Horgan, San Francisco, California, and Curtis R. Smith, Idaho Falls, Idaho, for the defendant-appellant.

John F. De Pue and Michael D. Taxay, Department of Justice, Washington, D.C., for the plaintiff-appellee.

## OPINION

BEA, Circuit Judge:

Today we consider the familiar "abuse of discretion" standard and how it limits our power as an appellate court to substitute our view of the facts, and the application of those facts to law, for that of the district court.

\*   \*   \*

### Introduction

David Hinkson refused to pay income tax on his business profits. He asserted the United States Constitution forbade the federal government from taxing a person's income. He was investigated by Internal Revenue Service Agent Steven Hines, prosecuted to a conviction for income tax evasion by United States Attorney Nancy Cook, and sentenced by United States District Judge Edward Lodge.

While awaiting trial on his tax evasion case, Hinkson solicited his friend and employee Elven Joe Swisher to torture and kill Hines, Cook, and Lodge, for $10,000 per head. Swisher reported Hinkson's solicitations to federal authorities.

Hinkson was indicted, tried, and convicted by a jury for solicitation of the murder of the three federal officials. Swisher testified on behalf of the government.

Hinkson then moved for a new trial principally on grounds that Swisher had fraudulently presented himself to Hinkson, and later to the judge and jury, as a Korean War veteran with experience in killing people, but he had no such war service nor experience. In brief, Swisher had falsely held himself out to be a war hero. The trial court denied the new trial motion.

Hinkson appealed this denial of his new trial motion and several evidentiary rulings made by the trial court.

We granted en banc review of the panel's decision to reverse the district court's denial of Hinkson's new trial motion and, for the reasons explained below, we conclude that our "abuse of discretion" standard is in need of clarification. The standard, as it is currently described, grants a court of appeals power to reverse a district court's determination of facts tried before it, and the application of those facts to law, if the court of appeals forms a "definite and firm conviction that a mistake has been committed." At the same time, the standard denies a court of appeals the power to reverse such a determination if the district court's finding is "permissible."

Because it has previously been left to us to decide, without further objective guidance, whether we have a "definite and firm conviction that mistake has been committed," or whether a district court's finding is "permissible," there has been no effective limit on our power to substitute our judgment for that of the district court.

Today, after review of our cases and relevant Supreme Court precedent, we re-state the "abuse of discretion" standard of review of a trial court's factual findings as an objective two-part test. As discussed below, our newly stated "abuse of discretion" test requires us first to consider whether the district court identified the correct legal standard for decision of the issue before it. Second, the test then requires us to determine whether the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record.

Applying our "abuse of discretion" test, we affirm the district court's rulings.

### Background

Hinkson owned and operated a Grangeville, Idaho water-bottling company called WaterOz, which sold bottled water with purported health benefits.

Elven Joe Swisher was a water safety tester for a nearby independent water testing company. In 2000, Hinkson hired Swisher to test the WaterOz water on an ongoing basis. Hinkson and Swisher became fast friends. Swisher told Hinkson he was a veteran of the United States Marine Corps and a firearms expert who had killed a number of people in the Korean War. Swisher would later testify this seemed greatly to impress Hinkson.

In April 2002, according to Swisher, Hinkson asked him to torture and kill local attorney Dennis Albers and his family because Albers had been causing legal trouble for Hinkson. Hinskon offered Swisher $10,000 per "head" in payment. Swisher thought Hinkson was joking and brushed off the suggestion.

Meanwhile, Hinkson was refusing to pay federal income tax on his WaterOz profits, asserting that the Constitution prohibits the federal government from collecting income tax. Assistant United States Attorney Nancy Cook and Internal Revenue Service Special Agent Steven Hines led an investigation into Hinkson's possible tax evasion.

Swisher would later testify that in July or August 2002, Hinkson asked him if he remembered his request regarding Albers and his family. Swisher said he did, and Hinkson told Swisher he wanted Cook and Hines and their families "treated in the same way as Albers." "I know you're used to it," Hinkson prodded Swisher, "I mean, you have killed people." Swisher, less convinced this time that Hinkson was joking, refused and threatened to report Hinkson to authorities.

In November 2002, Cook and Hines executed search warrants on Hinkson's home; Hines arrested Hinkson on tax evasion charges.[1] The magistrate judge freed Hinkson on bail

---

[1]The government eventually indicted and convicted Hinkson on tax evasion and related charges. *United States v. Hinkson*, 281 Fed. Appx. 651, 653 (9th Cir. 2008).

pending trial. Judge Edward J. Lodge of the United States District Court for the District of Idaho was assigned the case.

While Hinkson was on pretrial release on the tax evasion charges, Swisher later testified, Hinkson once again asked Swisher to torture and kill Cook and Hines and their families; this time he also added Judge Lodge to the list. Hinkson again offered Swisher $10,000 per "head," and even "pleaded" with Swisher to do the deed, calling Swisher his "best friend." Swisher declined.

The relationship between Swisher and Hinkson soon soured. A WaterOz employee named Richard Bellon sued Hinkson for control of WaterOz, and Hinkson in turn sued Swisher. Swisher counterclaimed against Hinkson for more than $500,000.

In January 2003, Hinkson met bodyguard-turned-restaurant manager James Harding at a "health forum" in Southern California. Hinkson offered Harding a job at WaterOz and invited him to stay in Hinkson's home. Harding later testified that, during his stay, Hinkson handed him a "large amount" of cash and offered him $20,000 total if he would kill Cook, Hines, and Lodge. Harding refused. In March 2003, Hinkson again asked Harding to kill Cook, Hines, and Lodge. Harding again refused. After this second request, Harding called the FBI and reported Hinkson's solicitations.

Shortly thereafter, in Spring or Summer 2003, Swisher told an Idaho state prosecutor that Hinkson had solicited him to kill Cook, Hines, and Lodge. Swisher then contacted the FBI and told the FBI the same.

On September 21, 2004, a federal grand jury in Idaho indicted Hinkson for soliciting the murders of Cook, Hines, and Lodge. The indictment contained 11 counts:

Counts 1 through 3 charged Hinkson with violating 18 U.S.C. § 373[2] when he solicited Harding to torture and kill Cook, Hines, and Lodge in January 2003.[3]

Counts 4 through 6 charged Hinkson with violating 18 U.S.C. § 373 when he solicited Harding to torture and kill Cook, Hines, and Lodge a second time, in March 2003.[4]

Counts 7 through 9 charged Hinkson with violating 18 U.S.C. § 373 by soliciting Swisher to torture and kill Cook, Hines, and Lodge.[5]

Counts 10 and 11 charged Hinkson with violating 18 U.S.C. § 115[6] by threatening to kill the children of Cook and Hines.[7]

---

[2]18 U.S.C. § 373(a): "Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force . . . against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or . . . fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years."

[3]The jury would eventually acquit Hinkson on these counts.

[4]The jury would eventually deadlock on these counts.

[5]The jury would eventually convict Hinkson on these counts.

[6]18 U.S.C. § 115(a)(1)(A) (Influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member): "Whoever . . . threatens to assault, kidnap or murder a member of the immediate family of a United States official, a United States judge, [or] a Federal law enforcement officer . . . [shall be imprisoned for a maximum of] six years."

[7]The jury would eventually acquit Hinkson on these counts.

### *Trial*

Hinkson's two-week jury trial began January 11, 2005. The government's opening statement revealed its theory of the case as to counts 7-11: that Hinkson solicited Swisher in particular to murder Cook, Hines, and Lodge because Hinkson believed Swisher was a battle-hardened Marine veteran with numerous military kills to his name. The prosecution also stated that Swisher was, in fact, such a battle-hardened veteran.[8]

The government called Swisher to testify three days later. On direct examination, although the prosecutor asked whether Swisher had served in the "Armed Forces"—and Swisher testified accurately that he had served in the U.S. Marine Corps —the prosecutor did not ask whether Swisher had engaged in combat or earned any decorations. Instead, the prosecutor confined his questions to what Swisher had *told* Hinkson of his combat experience. Swisher explained he had told Hinkson he was a Korean War veteran with substantial combat experience. Swisher also testified that Hinkson had solicited him to torture and kill Cook, Hines, and Lodge.

On cross-examination, Hinkson's attorney first sought to impeach Swisher's credibility by establishing that Swisher harbored animosity toward Hinkson. He asked about litigation involving the two former friends, and the bitter feud that had developed between them. Hinkson's attorney also attacked inconsistencies in Swisher's testimony.

After he had finished his cross-examination of Swisher for such animosity toward Hinkson, Hinkson's attorney asked for a sidebar conference with the judge and opposing counsel, outside the hearing of the jury. There he pointed out that

---

[8]Hinkson neither objected to, nor moved to strike, this statement. The trial judge instructed the jury statements of counsel were not evidence of their content. The prosecutor did not repeat this claim in opening or closing argument. Hinkson does not assign this statement error on appeal.

Swisher appeared to be wearing a Purple Heart on his lapel, and informed the court he had been trying to "dig into" Swisher's military history for "some time" because he did not believe Swisher had served in the Korean War nor earned a Purple Heart.[9] Hinkson's attorney pointed out that Swisher, born in 1937, would have been between the ages of 13-16 during the Korean War of 1950-53.

Hinkson's attorney then showed the court and counsel a letter he had received that morning from a Bruce Tolbert, an archives technician with the National Personnel Records Center, which maintained official military records for the Armed Forces ("Tolbert letter"). The Tolbert letter stated that Swisher's official military record did not list him as entitled to *any* personal military decorations, including a Purple Heart.

The prosecutor then noted that there was no testimony explaining what Swisher had on his lapel, and that the prosecutor did not know what it was. The prosecutor also pointed out that he had not questioned Swisher about his military record during direct examination. Rather, Swisher was questioned only about what he *told* Hinkson about his military record, because the government's theory of the case was that Hinkson's belief in Swisher's military experience was the reason he had solicited Swisher in particular to commit the murders.

Hinkson's attorney moved to re-open cross examination to inquire about Swisher's purported military service and the object on his lapel. The prosecutor suggested Hinkson's attorney should not "go there." But Hinkson's attorney wanted to "go there," and the court granted the motion to re-open cross-

---

[9]Indeed, Hinkson's counsel had learned of Swisher's claims of martial glory at Swisher's deposition three months earlier in the WaterOz case, and again with the recent delivery of the transcript of Swisher's testimony before the Grand Jury that had indicted Hinkson for the charges on trial. For more details, *see infra* at 14967-68.

examination. In response to Hinkson's attorney's questions, Swisher testified he was wearing "a Purple Heart medal" awarded to him by the United States government, and that he served in combat "following" the Korean War on classified missions to free prisoners of war held in secret North Korean prison camps.

Hinkson's attorney then placed the Tolbert letter (which stated Swisher had been awarded no medals) before Swisher and asked him whether he still maintained that he was a combat veteran who had earned a Purple Heart medal. Swisher reiterated that he did, and, in a moment of Perry Mason courtroom drama, whipped from his jacket pocket a form titled "Replacement DD-214."[10] Swisher's "Replacement DD-214" form was stamped "certified," signed by a Capt. W. J. Woodring, and dated October 1957. The form read that Swisher had been awarded, and was entitled to wear, the Purple Heart medal, the Silver Star, the Navy and Marine Corps medal with Gold Star, and the Navy and Marine Corps Commendation Medal with Combat "V." The form also stated Swisher was injured by shrapnel in combat.[11]

The court asked for a copy to be made of the "Replacement DD-214" form for each party to review; the prosecutor replied that he already had a copy—perhaps explaining why he had suggested to defense counsel he not "go there."[12] Hinkson's attorney then moved for a mistrial on the ground the prosecu-

---

[10]A DD-214 form is the military's official discharge form, which lists final rank and injuries or decorations, if any.

[11]The only decoration before the jury was the Purple Heart, as to which the trial judge ordered all such testimony stricken and to be disregarded. The other decorations mentioned in the DD-214 were never mentioned to the jury. The DD-214 was not admitted into evidence; its content was not read to the jury.

[12]Hinkson makes no claim on appeal the "Replacement DD-214" produced by Swisher at trial, a copy of which was in the prosecutor's file, constituted exonerating evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

tor admitted he knew of Swisher's "Replacement DD-214" form previously and should have spoken up about it. The prosecutor replied that Hinkson's attorney, not the government, had brought up the issue whether Swisher was a decorated combat veteran, and the prosecutor had even warned Hinkson's attorney not "to go there," so the government bore no responsibility for Swisher's testimony on the subject. The court agreed with the government that Hinkson's attorney had tried for a "grandstand play" that had backfired. However, the court decided to instruct the jury that, after "a long day . . . I made a mistake in allowing the questioning with regard to the Purple Heart medal," and the jury should "disregard completely all of Mr. Swisher's testimony with regard to that military commendation."

Five days later, on January 19, 2005, Hinkson's attorney told the court the National Personnel Records Center would provide a certified copy of Swisher's full military record, but only pursuant to a court-issued subpoena. The court issued a subpoena for Swisher's full military record that same day.

Two days later, on January 21, 2005, outside the presence of the jury, the government brought to the court's and Hinkson's attorney's attention a letter from Lt. Col. K. G. Dowling of the National Personnel Management Support Branch of the United States Marine Corps, to Ron Keeley of the Idaho Veterans Affairs Services ("Dowling" letter). The government could not specify precisely when it received the letter, except that it received the letter the preceding week.[13]

The Dowling letter was a response to Keeley's inquiry to the Marine Corps records department after Swisher attempted to use the "Replacement DD-214" form he produced on the

---

[13]As part of this appeal, the government sought and received judicial notice of documents that were not before the district court and that show the prosecutor received the Dowling letter on January 19, 2005. Hinkson makes no *Brady* claim on appeal as to the Dowling letter.

stand to obtain benefits from the Idaho branch of the Department of Veterans Affairs. Keeley had inquired of Dowling whether Swisher's "Replacement DD-214" was legitimate. Dowling's response letter stated Swisher's purported "Replacement DD-214" form did not exist in Swisher's official file. Instead, according to the Dowling letter, the "Replacement DD-214" form in Swisher's official file clearly read that Swisher had not been awarded *any* medals and that, in fact, he was injured in an automobile accident in Washington State, not in combat. Further, the Dowling letter noted several of the medals listed on Swisher's purported "Replacement DD-214" form did not even exist in 1957, when the form was dated.

That same day, January 21, 2005, Swisher's official military file arrived at the court. The file contained a "Replacement DD-214" form identical to the form described in the Dowling letter—that is, a form listing no medals and no combat wounds. Swisher's official military file also contained the Dowling letter itself, and two photocopies of documents Keeley had sent to Dowling for authentication: (1) the Swisher-produced "Replacement DD-214" form, and (2) a letter Swisher provided Keeley along with it. This letter, which bore the signature of the same Woodring (now a Colonel) whose signature appeared on Swisher's purported "Replacement DD-214" form, was dated October 16, 1957 ("Woodring letter"). The Woodring letter stated the Purple Heart and other medals listed on Swisher's purported "Replacement DD-214" form had been "certified" by military command and that Swisher was entitled to wear them.

After reading Swisher's full military record *in camera*, the court informed counsel that Swisher's military file appeared to state Swisher was involved in "top secret activities" and was "awarded the medals he says he was awarded." The court concluded, however, the file was "very difficult to decipher" and the documents were "neither self-authenticating nor self-explanatory." The court stated it was "not convinced" one way or the other whether the Swisher-produced "Replacement

DD-214" form was credible because Swisher's military record was "not explanatory."

The court said evidence that might establish whether Swisher was a fraud could include testimony from a custodian of military records who could interpret Swisher's military file, or from Col. Woodring, whose signature appeared on the Swisher-produced "Replacement DD-214" form. Hinkson's attorney did not move for a continuance of the trial to allow him time to procure such a custodian to decipher the military record, or to procure testimony from Col. Woodring.

Hinkson's attorney nevertheless offered both the Dowling letter and Swisher's military file into evidence. The court found both inadmissible for two reasons: (1) the Dowling letter and Swisher's military file were unauthenticated and facially inconclusive as to whether Swisher had lied about his military record, and without any foundation, the court excluded the evidence under Federal Rule of Evidence 403 as distracting, confusing, and a waste of significant time; and (2) the documents had no relevance other than as extrinsic evidence probative of a specific incident of Swisher's untruthfulness, and thus were objectionable under Federal Rule of Evidence 608(b).[14]

The court gave Hinkson's attorney an option to re-open cross-examination of Swisher to *inquire* about Swisher's military record and the veracity of his prior testimony about his medals. The court also cautioned Hinkson's attorney he could not introduce the Dowling letter or military record into *evi-*

---

[14]Fed. R. Evid. 608(b): "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

*dence*, because introduction of such extrinsic evidence was prohibited by Fed. R. Evid. 608(b). Hinkson's attorney chose not to re-open cross-examination.

Four days later, on January 25, 2005, the government gave a closing argument that contended Hinkson's belief that Swisher was a tough combat veteran with multiple kills to his name was the reason Hinkson solicited Swisher to kill Cook, Hines, and Lodge.

The jury deliberated for two days before convicting Hinkson of soliciting Swisher to kill Cook, Hines, and Lodge. The jury deadlocked on whether Hinkson solicited Harding to kill Cook, Hines, and Lodge in March 2003, and acquitted Hinkson on each of the other counts.

### *Motion for a New Trial*

Hinkson timely moved for a new trial under Federal Rule of Criminal Procedure 33 based, in relevant part, on "newly discovered evidence" that Swisher's "Replacement DD-214" form was forged and that Swisher committed perjury regarding his military record.[15] Hinkson accompanied his motion with affidavits from (1) Chief Warrant Officer W. E. Miller, the Marine Corps liaison to the National Personnel Records Center ("Miller affidavit"), and (2) Col. Woodring, whose signature was affixed to the Woodring letter that validated the Swisher-produced "Replacement DD-214" form, as well as that apparently bogus "Replacement DD-214" form itself ("Woodring affidavit").

The Miller affidavit averred Swisher was never awarded any of the medals he claimed, and that he was injured in a private motor vehicle accident in Washington state. The Miller

---

[15]Hinkson makes no claim the government produced testimony it knew was perjured. *See Napue v. Illinois*, 360 U.S. 264 (1959).

affidavit further stated that the Swisher-produced "Replacement DD-214" form was forged.

The Woodring affidavit averred Col. Woodring had never signed the letter in Swisher's file that Swisher provided Keeley when seeking veterans benefits, and that the signature in the letter had been artificially superimposed. The Woodring affidavit also averred that Col. Woodring never signed Swisher's purported "Replacement DD-214" form.[16]

The district court denied Hinkson's motion for a new trial. The order denying Hinkson's motion for a new trial stated the trial court's findings that Hinkson failed to meet his burden of demonstrating a right to a new trial based on the five factors discussed in *United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005). The *Harrington* factors are:

(1) the evidence must be newly discovered;

(2) the failure to discover the evidence sooner must not be the result of the defendant's lack of diligence;

(3) the evidence must be "material" to the issues at trial;

(4) the evidence may not be (a) cumulative or (b) "merely impeaching"; *and*

(5) the evidence must indicate that a new trial would "probably" result in acquittal.

*Id.* at 601.

First, the district court held "most" of the now-proffered

---

[16]Based on this evidence, on August 30, 2007, a jury convicted Swisher of wearing an unearned medal in violation of 18 U.S.C. § 704(a) and other related offenses.

evidence in the Miller and Woodring affidavits was not "newly discovered" because it contained no new information but only the substance of the evidence Hinkson had attempted to introduce at trial: that Swisher did not have the military record he claimed and was not entitled to the honors he testified he won. The court thus found the evidence offered nothing substantively "new."

Second, the district court concluded Hinkson had not been diligent in acquiring the evidence contained in the Miller and Woodring affidavits. The court pointed out that Hinkson's attorney stated during trial that he had been investigating Swisher's military record for "quite some time" because he was doubtful, given Swisher's 1937 birth date, that Swisher had served in the 1950-53 Korean War. Further, the court noted that Swisher had testified, as a party witness in an October 2004 deposition—three months before Hinkson's trial on murder solicitation charges—to his claimed, but perhaps bogus, military record. That deposition was taken by the same attorney who represented Hinkson in his criminal trial. In addition, the court related that Swisher had testified to the same Korean War combat experience in his appearances before the federal grand jury investigating Hinkson's tax and solicitation crimes, and the government had delivered transcripts of Swisher's grand jury testimony to Hinkson a week before this case came on for trial. The court thus found Hinkson had sufficient opportunity and time to uncover and produce the evidence contained in the Miller and Woodring affidavits before the end of trial.

Third, the district court held Hinkson's proffered evidence was not "material" to the issues at trial because the evidence was inadmissible under Federal Rule of Evidence 608(b) as extrinsic evidence offered to impeach a witness on a specific instance of untruthfulness. The court also reiterated its earlier holding that the evidence was excludable under the Federal Rule of Evidence 403.

Fourth, the district court found the proffered evidence was both cumulative of evidence proffered at trial and "merely impeaching." The court found the evidence cumulative because it repeated Hinkson's attorney's assertions that Swisher was not the military hero he claimed to be, assertions Hinkson made at trial based on Swisher's age. The court found the evidence "merely impeaching" because it did nothing more than attack Swisher's credibility regarding his military service rather than his testimony regarding the solicitations charged. Further, the Court found Hinkson had several other opportunities to question Swisher's credibility, based on (1) Swisher's youth at the time of the Korean War, (2) Swisher's ongoing feud with Hinkson over WaterOz, and (3) Hinkson's opportunity to show the Dowling letter to Swisher in a re-opened cross-examination of Swisher (an offer Hinkson's attorney had declined).

Fifth, the district court found the proffered evidence did not indicate a new trial would "probably" result in acquittal, because the evidence would be inadmissible on such new trial under Federal Rule of Evidence 403 or 608(b). Also, the court had ordered *all* testimony regarding Swisher's Purple Heart stricken from the record and instructed the jury to disregard it, so the Miller and Woodring affidavits could have no practical effect on the jury's deliberations; Swisher's claim to the Purple Heart was no longer before the jury.

Hinkson timely appealed his conviction on three grounds. First, Hinkson contends he was entitled to a new trial based on his discovery of the Miller and Woodring affidavits, which Hinkson contends conclusively established Swisher lied about his military record.[17] Second, Hinkson contends the district court erred by precluding Hinkson from introducing the Dow-

---

[17]Hinkson appeals the district court's denial of his motion for a new trial *solely* based on Hinkson's contention the district court erred in its consideration of his claimed "newly discovered" evidence of the Miller and Woodring affidavits.

ling letter and Swisher's military file into evidence during trial. Third, Hinkson contends the government engaged in prosecutorial misconduct by mentioning Swisher's military service in its closing argument when it had reason to doubt Swisher's truthfulness.

\*   \*   \*

## Analysis

### *Motion for a New Trial*

We review a district court's order denying a motion for a new trial made on the ground of newly discovered evidence for abuse of discretion. *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992). We invoke that standard of review as we have hundreds of times before, but this case forces us to step back and consider precisely what "abuse of discretion" means, in the context of a trial court's factual findings, as applied to legal rules.

In this case, the district court's analysis of Hinkson's motion for new trial involved an application of fact to law— whether the facts as they occurred at trial, combined with Hinkson's purported "newly discovered" evidence, warranted a new trial under controlling law. We review applications of fact to law in one of two ways: if the district court's application of fact to law "requires an inquiry that is essentially factual," we review it as if it were a factual finding; if the district court's application of fact to law requires reference to "the values that animate legal principles," we review it as if it were a legal finding. *See United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984). Here, the entirety of the district court's analysis rested on the specific facts as they occurred at trial and the relative factual importance of Hinkson's purported "newly discovered" evidence. The court's analysis did not rest on "the values that animate legal principles," such as the meaning of due diligence or the conceptual basis for

granting new trials, but instead was, in all respects, "essentially factual." Accordingly, for standard of review purposes, we treat the district court's application of fact to law here exactly the same way as we treat factual findings.

The Supreme Court explained the meaning of the abuse of discretion standard in *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384 (1990), where the court stated, "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* at 405. In other words, the Court defined abuse of discretion review of factual findings in terms of "clearly erroneous" review, holding that "[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous." *Id.* at 400-01.

When considering whether a district court erred in applying law to facts, we look to the substance of the issue on review to determine if the question is factual or legal. "If application of the rule of law to the facts requires an inquiry that is 'essentially factual,'—one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,'—the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard." *McConney*, 728 F.2d at 1202 (quoting *Comm'r v. Duberstein*, 363 U.S. 278, 289 (1960) (internal citation omitted)). This category includes questions such as motive, intent, and negligence. *See id.* at 1203-04. "If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and

reviewed de novo." *Id.* at 1202. This category includes questions such as whether defendants' conduct constituted a conspiracy in violation of the Sherman Act, and questions that implicate constitutional rights. *Id.*

When reviewing factual findings, the Supreme Court has held that "a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The *U.S. Gypsum Co.* definition of "clearly erroneous" review permits an appellate court to find a trial court's factual determination is clearly erroneous—regardless whether there is some record evidence on which the trial court grounded that determination—if the court of appeals decides, "definitely and firmly," that the trial court made a "mistake." The Court has repeatedly affirmed the *U.S. Gypsum Co.* explanation of the clearly erroneous standard of review. *See*, *e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (noting that under the "clear error" standard of review, "a reviewing court must ask 'whether, on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed' ").

The year after *U.S. Gypsum Co.*, however, the Supreme Court held in *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949), that a trial court's "choice between two permissible views of the weight of evidence is not 'clearly erroneous' " where the evidence "would support a conclusion either way." This contrasts with the notion expressed in *U.S. Gypsum Co.* that a reviewing court may reverse as clearly erroneous a trial court's factual findings whenever the reviewing court develops a "definite and firm conviction" that the trial court made a "mistake." Yet, as with the *U.S. Gypsum Co.* explanation of clearly erroneous review, the Supreme Court has also repeatedly affirmed the *Yellow Cab Co.* definition of "clearly erroneous" review. *See, e.g., Cooter & Gell*, 496 U.S. at 400-401 (1990) ("Where there are two permissible views of

the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Because the Supreme Court has maintained both the *Yellow Cab Co.* and *U.S. Gypsum Co.* definitions of "clearly erroneous" review, our court currently holds that "[a] district court abuses its discretion when it makes an error of law, rests its decision on clearly erroneous findings of fact, or when we are left with 'a definite and firm conviction that the district court committed a clear error of judgment.' " *United States v. 4.85 Acres of Land, More or Less, Situated in Lincoln County, Mont.*, 546 F.3d 613, 617 (9th Cir. 2008). This present standard, particularly given the final clause, is so broad as to provide us with little effective direction as to when we can exercise our power to reverse a district court's factual finding. Despite the wide latitude seemingly provided to appellate courts by *U.S. Gypsum Co.*'s "definite and firm conviction" definition of clear error, we know from *Yellow Cab Co.* and its progeny that our review of a factual finding may *not* look to what we would have done had we been in the trial court's place in the first instance, because that review would be de novo and without deference. Rather, the scope of our review limits us to determining whether the trial court reached a decision that falls within any of the permissible choices the court could have made. In other words, the Supreme Court's precedent convinces us that any "definite and firm conviction" of the reviewing court must still include some measure of deference to the trial court's factual determinations.

This principle is illustrated in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985). In *Anderson*, the trial court had made a series of factual findings from which it concluded the female candidate for Recreation Director was skipped over for the job due to her gender, all in violation of Title VII of the Civil Rights Act of 1964.

On appeal, the Fourth Circuit, after giving "close scrutiny of the record," *Anderson*, 470 U.S. at 571, made findings con-

trary to those of the trial court: the court of appeals found that the female candidate was not, in fact, the most qualified candidate, and that, according to its own weighing of the evidence, the selection committee had not been biased against the candidate because she was a woman. Thus, the appellate court held the district court's factual findings were clearly erroneous, and reversed.

Considering the analyses of both the trial court and the appellate court, the Supreme Court concluded that "[e]ach has support in inferences that may be drawn from the facts in the record" and neither was "illogical or implausible." *Id.* at 577. Because all the reasons for appellate court deference to trial court factual findings frame the proper issue as whether the *trial court*'s findings—not the appellate court's—were clearly erroneous, the Court held the court of appeals had erred in concluding the trial court's findings were clearly erroneous; the appellate court's contrary findings were just as much a "permissible" view of the evidence as the trial court's. *See id.* at 574.

Thus, in *Anderson*, the Court held a trial court's findings were *not* clearly erroneous even though the court of appeals had developed a "definite and firm conviction that a mistake has been committed," *id.* at 573, because the trial court's "permissible" findings were not "illogical or implausible" and had "support in inferences that may be drawn from the facts in the record." *Id.* at 577. It follows that even when a court of appeals determines a trial court's findings are "permissible" (*Yellow Cab Co.*) or not a "mistake" (*U.S. Gypsum Co.*), the court of appeals must *reverse* if the district court's determination is "illogical or implausible" or lacks "support in inferences that may be drawn from facts in the record."

In sum, this analysis leads us to conclude that, by way of the *Anderson* case, we can create an objective abuse of discretion test that brings the *Yellow Cab Co.* and *U.S. Gypsum Co.* lines of cases together.

### *Our Abuse of Discretion Test*

**[1]** We adopt a two-part test to determine objectively whether a district court has abused its discretion in denying a motion for a new trial.

**[2]** The Supreme Court has held that a district court abuses its discretion when it makes an error of law. *Cooter & Gell*, 496 U.S. at 405 ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ."). Thus, the first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested.[18] If the trial court failed to do so, we must conclude it abused its discretion.

**[3]** If the trial court identified the correct legal rule, we move to the second step of our abuse of discretion test. This step deals with the tension between the Supreme Court's holding that we may reverse a discretionary trial court factual finding[19] if we are "left with the definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395, and its holding that we may not simply substitute our view for that of the district court, but rather must give the district court's findings deference, *see Nat'l Hockey League*, 427 U.S. at 642. Resolving that tension by reference to *Anderson*, we hold that the second step of our abuse of discretion test is to determine whether the trial court's application of the correct legal standard was (1) "illogical," (2) "implausible," or (3) without "support in inferences that may be drawn from the facts in the record."[20] *Anderson*, 470 U.S. at 577. If any

---

[18]Here, for instance, the correct legal rule for analyzing a motion for a new trial based on "newly discovered" evidence is found in the *Harrington* test.

[19]Or "essentially factual" application of fact to law. *See McConney*, 728 F.2d at 1202.

[20]We do not think this test is redundant of the previous, conflicting explanations of clearly erroneous review: that the court of appeals must

of these three apply, only then are we able to have a "definite and firm conviction" that the district court reached a conclusion that was a "mistake" or was not among its "permissible" options, and thus that it abused its discretion by making a clearly erroneous finding of fact.[21]

affirm a district court factual finding that is "permissible" (*Yellow Cab Co.*), but that the court of appeals must reverse a district court's factual finding any time it "has a definite and firm conviction that a mistake has been made" (*U.S. Gypsum Co.*).

First, according to Merriam-Webster, the word "permissible" simply means "allowable." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, "permissible" (11th ed. 2008). But: what kind of a district court determination is "allowable"? The word itself provides no objective answer, and thus a court of appeals might be bound to affirm a trial court's finding that reflected the trial court's subjective determination or whim. Our invocation of *Anderson* at the second step of our abuse of discretion test removes this risk by providing a more firm, objective guide to determine what kind of factual finding should be affirmed.

Second, the "definite and firm conviction" standard essentially requires the court of appeals to decide with "conviction" that "a mistake has been made." But: how is the court of appeals to know what constitutes a "mistake"? Again, the answer is: a determination that is illogical, implausible, or without basis in the record. Once more, this test gives body to the otherwise totally open-ended standard that a court of appeals may reverse a district court's "mistake."

Finally, we must remember the Supreme Court itself used the factors outlined in our abuse of discretion test to formulate its analysis in *Anderson*, and used those factors in a fashion that was not redundant or cumulative of the other explanations the Court gave for the clearly erroneous standard of review.

[21]This view of our test for abuse of discretion review—one that looks to whether the district court reaches a result that is illogical, implausible, or without support in inferences that may be drawn from the facts in the record—is one that already has partial support in a number of our cases and in those of other circuits. *See, e.g.*, *Wilderness Soc'y v. Babbitt*, 5 F.3d 383, 387 (9th Cir. 1993) ("The court's decision . . . is not implausible and, based upon this factor alone, the court's decision would not be considered an abuse of discretion."); *see also Savic v. United States*, 918 F.2d 696, 700 (7th Cir. 1990) ("A finding is clearly erroneous when, although there may be some evidence to support it, 'the reviewing court on the entire evi-

A significantly deferential test that looks to whether the district court reaches a result that is illogical, implausible, or without support in inferences that may be drawn from the record makes particularly good sense in the context of a motion for new trial. *See United States v. Heath*, 260 F.2d 623, 626 (9th Cir. 1958) ("To prevent possible prejudice on trial beyond the general atmosphere of impartiality which traditionally pervades the courtroom, trial judges have wide discretion to methods of control. Among these are . . . grant of new trial."); *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003) ("The district court is most familiar with the context of the trial, and enjoys broad discretion with regard to a new trial motion."); *see also Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court.").

Accordingly, we hold that when we review for abuse of discretion a district court's denial of a motion for a new trial, we first look to whether the trial court identified and applied the correct legal rule to the relief requested. Second, we look to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. In other words, our abuse of discretion test means that we do not automatically *affirm* a district court's factual finding if we decide it is "permissible," and we do not auto-

---

dence is left with the definite and firm conviction that a mistake has been committed.' We may have such a conviction if the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence.' ") (citations omitted), *cert. den.*, 502 U.S. 813 (1991); *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) ("A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole."); *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 634 (6th Cir. 2000) ("[W]e cannot conclude that the district court's decision was so unreasonable, illogical, or arbitrary as to constitute an abuse of discretion.").

matically *reverse* a district court's factual finding if we decide a "mistake has been committed." Rather, in either case, we will affirm a district court's factual finding[22] unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record.[23]

---

[22]Or "essentially factual" application of fact to law. *See McConney*, 728 F.2d at 1202.

[23]Appellate review of a district court's decision to abstain from exercising jurisdiction over a case is not altered by our opinion today. A district court's decision to abstain from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971), is reviewed de novo in this circuit. *World Famous Drinking Emporium Inc. v. Tempe*, 820 F.2d 1079, 1081 (9th Cir. 1987). Moreover, in abstention cases arising under *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), "abuse of discretion" is a phrase used exclusively to perform a legal question analysis, not an analysis of factual findings. For example, in *Pullman*, the Supreme Court held, *sua sponte*, that the district court "should have exercised its wise discretion" to abstain from exercising jurisdiction, because a state statute could potentially decide the issue, a state court had not yet interpreted that state statute, and the application of that state statute could avoid the federal constitutional question in the case. These were all legal, not factual, issues.

In the rare case in which a district court's factual findings *do* affect its decision to apply the abstention doctrine, those factual findings would be reviewed for abuse of discretion as we clarify that standard today. For example, in *Pullman*, suppose a porter sues the Texas Railroad Commission in district court, and in its first response to the complaint, the Commission moves to dismiss on grounds the plaintiff is not actually a certified porter and has no standing to sue. The porter submits a certification document which the Commission claims is bogus. The district court's ruling on the authenticity of the document, crucial to its decision on standing, would be reviewed for abuse of discretion. It would make no sense to review the district court's factual finding under a standard other than the abuse of discretion standard we announce today. If we attempted a de novo review of that factual finding, we would be straying far from our role as an appellate court. Rather, the sensible approach is to uphold the trial court's finding of fact, provided that finding is not illogical, implausible, or without any support in the record.

### *Application of Our Abuse of Discretion Test*

**[4]** Applying this test to the case at bar, we conclude the district court did not abuse its discretion in denying Hinkson's motion for a new trial based on "newly discovered" evidence of the Miller affidavit (which averred Swisher was never awarded any of the medals he claimed, that he was injured in a private motor vehicle accident in Washington state, and that the purported "Replacement DD-214" form Swisher produced on the stand was forged) and the Woodring affidavit (which averred Col. Woodring never signed the letter in Swisher's file that Swisher provided Keeley when seeking veterans benefits, and that Col. Woodring never signed Swisher's purported "Replacement DD-214" form, which Swisher produced on the witness stand).

First, we look to whether the district court identified the correct legal standard. Here, the district court accurately identified the correct five-part legal test outlined in *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005), to analyze Hinkson's motion for a new trial brought on the basis of newly discovered evidence.[24]

The *Harrington* test requires a party seeking a new trial to prove each of the following: (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial. *Id.*

Second, because the *Harrington* test is essentially factual, requiring considerations that are "founded on the application of the fact-finding tribunal's experience with the mainsprings of human conduct," rather than requiring "consideration of

---

[24]The district court cited to *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003), which used the same test as did *Harrington*.

abstract legal principles," *McConney*, 728 F.2d at 1202, we look to whether the district court's findings of fact, and its application of those findings of fact to the *Harrington* factors, were illogical, implausible, or without support in inferences that may be drawn from facts in the record.

**[5]** Under the initial step of the *Harrington* test, the district court found the Miller and Woodring affidavits did not contain "newly discovered" evidence because the substance of the affidavits was simply not "newly discovered." The district court found that the information contained in the Miller and Woodring affidavits, while newly written, did not provide any new *information* that was not already considered and rejected from evidentiary admission by the court: the affidavits merely supported the previously proffered evidence that Swisher's purported "Replacement DD-214" form was phoney and that he had not earned any medals. The district court's determination the proffered affidavit evidence was not "newly discovered" was logical and plausible, based on the facts in the record. Thus, the court's conclusion did not constitute a clearly erroneous factual finding nor an abuse of discretion.

**[6]** Second, the district court found Hinkson's counsel was not diligent in seeking the purported newly discovered evidence, as required by the second *Harrington* step, because, before his re-opened cross-examination of Swisher at trial on January 14, 2005, counsel told the court he had been investigating Swisher's military record for "quite some time." In fact, three months before trial, the same counsel had represented Hinkson in a civil action in which Hinkson and Swisher were bitter adversaries, and had deposed Swisher. At his deposition, Swisher claimed battlefield injuries from grenade explosions and that he was born in 1937, putting him at age 13-16 during the 1950-53 Korean War.[25] (The govern-

---

[25]The minimum age for enlistment in the Armed Forces during the Korean War was 18, or 17 with parental consent. *See* 10 U.S.C. §§ 628, 634 (1952).

ment also disclosed Swisher's grand jury testimony a week before trial, in which Swisher made the same claims.) Yet, counsel still did not procure the Miller and Woodring affidavits (much less Miller and Woodring's presence as witnesses) until February 24 and 27, more than a month after the first cross-examination of Swisher and nearly four months after suspicions first should have been raised by Swisher's deposition testimony in the civil action. Nor did Hinkson's counsel request a continuance during trial to seek out the proof contained in the Miller and Woodring affidavits, which was precisely the evidence the district court said might help it understand Swisher's true military record. Based on these facts, the district court's finding that Hinkson's attorney did not exercise due diligence in seeking authoritative evidence of Swisher's true military past was logical, plausible, and based on inferences drawn from the facts in the record. Thus, it was not a clearly erroneous finding nor an abuse of discretion.[26]

[7] Third, the district court found the Woodring and Miller affidavits were not material to the case in any event, as required by the next *Harrington* step, because they related evidence that would be inadmissible under Federal Rule of Evidence 403. The district court found the probative value of the evidence described in the Miller and Woodring affidavits was substantially outweighed by the danger of confusion of the issues, misleading the jury, undue delay, and waste of

---

[26]The dissent confuses the issue by stating that it was the government that was not diligent in investigating the record of its star witness at trial. The issue is *not* what the government should or should not have done to assist defense counsel in determining whether Swisher was lying about his military record (a fact that is not material to the underlying issue at trial). *Harrington* asks this: did *defense counsel* act diligently in pursuing the evidence it wishes to proffer at a new trial? *Harrington*, 410 F.3d at 601. Defense counsel waited *months* after being put on notice Swisher's military service claims could be bogus before procuring the Woodring and Miller affidavits and failed to even request a continuance from the district court in the interim. The district court correctly found that defense counsel was not diligent.

time. After all, the material point was whether Swisher *told* Hinkson he had killed men in battle, not whether he had actually done so; the relevancy was to whether Hinkson offered Swisher money to kill three targets of Hinkson's ire.[27] The district court concluded that substantial time waste and confusion would result from proof of authentication and explanation of the documents, and all for a tangential issue unrelated to the factual issues to be resolved by the jury. This conclusion, which rests within the traditional powers given to trial judges to conduct trials, was based on plausible inferences from facts in the record, especially given the district court's advantage in determining how to run its courtroom efficiently. Thus, it was not a clearly erroneous finding nor an abuse of the court's discretion.

[8] Fourth, as discussed above, the district court found the Miller and Woodring affidavits offered no new information beyond that which had already been proffered for admission into evidence but rejected as inadmissible—that Swisher had not won any decorations during the Korean War and that his purported "Replacement DD-214" was bogus. For that reason, the district court concluded the information in the claimed "newly discovered" evidence was cumulative of information proffered during trial. Thus, the court found a new trial unnecessary under the fourth *Harrington* step, which requires the "newly discovered" evidence not be "cumulative."

The only new fact revealed by the Miller and Woodring affidavits was that the Woodring signature on the Swisher-produced "Replacement DD-214" form was a forgery. However, Hinkson's attorney had already proffered evidence that

---

[27]This is a similar issue to that which arises in cases where undercover police officers sell cocaine-labeled powdered sugar to unsuspecting purchasers, who are then charged with attempted purchase of a controlled substance; the only relevant question is whether the purchaser thought he was buying cocaine, not whether it was indeed cocaine that was purchased. *United States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978).

such "Replacement DD-214" form was a forgery, in the form of the Tolbert and Dowling letters. Accordingly, the district court's conclusion that, based on the facts in the record, the information contained in the Miller and Woodring affidavits was cumulative of information in previously proffered evidence, was not illogical or implausible.

**[9]** Further, the district court found the evidence served no purpose other than to impeach Swisher, which also doomed Hinkson's new trial motion under the fourth step of the *Harrington* test. Hinkson contends Swisher was a critical witness for the government's case, so any impeachment of his credibility would have undermined the government's entire case. But, even if Hinkson's contention were not post-hoc speculation, it does not change the fact that evidentiary admission of the extrinsic Miller and Woodring affidavits would serve no purpose other than to impeach Swisher's testimony as to his military record rather than his testimony as to Hinkson's solicitations. It is not material whether Swisher's wearing of a miniature Purple Heart when he testified constituted a statement regarding his military service, because the Miller and Woodring affidavits would serve only to impeach that statement, and thus still not constitute evidence that Swisher did not portray himself as a grizzled combat killer to Hinkson or that Hinkson did not solicit Swisher to kill the three targeted individuals. Thus, the district court's finding that the "newly discovered" evidence served only to impeach Swisher's testimony was logical, plausible, and based entirely on the facts in the record. Consequently, it was not a clearly erroneous finding nor an abuse of discretion.

**[10]** Finally, the district court found that because the government's theory of the case was simply that Hinkson believed Swisher was a battlefield veteran, and not that Swisher actually was one, the evidence described in the Woodring and Miller affidavits did not make it probable the jury would acquit on retrial, as required by the fifth step of the *Harrington* test. At most, the affidavits related evidence that

Swisher was a liar with regard to his military past. But extrinsic evidence that someone lied about a particular event in his past—such as the extent of his military service—is, as discussed, excludable under Rule 403. So, what effect on a jury could excluded evidence have? None. Thus, the district court's finding that the "newly discovered" evidence was not likely to change the result in a re-trial was logical based on its evidentiary ruling and its plausible interpretation of the facts in the record.[28] Therefore, it was not a clearly erroneous finding nor an abuse of discretion.

[11] Accordingly, the district court (1) identified the correct legal standard to analyze Hinkson's motion for a new trial, and (2) the court's findings of fact, and its application of those findings of fact to the correct legal standard, were not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. Therefore, the district court did not abuse its discretion in denying Hinkson's new trial motion.

### *Exclusion of Evidence at Trial*

Hinkson also contends the district court violated his constitutional rights to present a defense, to confront witnesses against him, and to a fair trial because the district court incorrectly refused to admit into evidence the Dowling letter (which stated Swisher's "Replacement DD-214" form was not in Swisher's official military file) and Swisher's official mili-

---

[28]It is speculation to conclude acknowledgment of Swisher's routine, rather than heroic, military history would cause the government to keep him off the stand on a retrial. Prosecutors are accustomed to proving their cases through unsavory individuals, and a timely pre-trial motion would limit questioning about Swisher's military history other than as told to Hinkson. As the dissent states at length, Swisher's credibility could *now* be impeached additionally by proof of his conviction for wearing an unearned medal. But that conviction had not occurred at the time of Hinkson's new trial motion and could play no part in the trial judge's estimation of the probable result of a new trial. The trial judge did not err.

tary file itself, which the district court found to be unauthenticated and indecipherable. The district court found this evidence inadmissible under Federal Rules of Evidence 403 and 608(b). Because we hold the district court did not abuse its discretion when it excluded the evidence under Rule 403, we need not reach the issue raised under Rule 608(b).

**[12]** Hinkson contends the district court erred by excluding the Dowling letter and Swisher's military file from evidence under Rule 403. A district court's Rule 403 determination is subject to great deference, because "the considerations arising under Rule 403 are 'susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues.' " *R.B. Matthews, Inc. v. Transamerica Transp. Serv., Inc.*, 945 F.2d 269, 272 (9th Cir. 1991). Here, the district court weighed the limited probative value of the evidence—to impeach testimony by Swisher about his Purple Heart medal, which testimony the jury had already been instructed to disregard—against the time it would take to authenticate and explain the military file (which the court found facially indecipherable) and the risk of confusing the jury with the tangential evidence. The court concluded the risk substantially outweighed the reward, and this conclusion, which was not illogical nor implausible based on the record, did not exceed the bounds of the district court's discretion in applying Rule 403.

### *Error in Closing Argument*

Hinkson contends the district court erred by failing to order a new trial *sua sponte* after the government's closing argument because the prosecutor, knowing that Swisher likely was not a combat veteran, argued to the jury that Swisher *told* Hinkson he was a combat veteran, and that is why Hinkson solicited Swisher to murder Cook, Hines, and Lodge. Review is for plain error because Hinkson failed to object below. *United States v. Olano*, 507 U.S. 725, 731-32 (1993). A plain error is (1) an error (2) that is plain, (3) that affects "substan-

tial rights," and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009).

**[13]** Hinkson's contention lacks merit. The government's only references to Swisher's military background in its closing argument were to point out that Swisher had told Hinkson he was a combat veteran—not that Swisher necessarily was one. Even if Swisher had never served in the military at all, it was enough that the jury found Hinkson *believed* he did. The government did not argue in closing that Swisher should be deemed more credible or believable on account of his purported military heroism, or that he was more likely to be a murderer-for-hire because of his military record. Accordingly, the district court did not plainly err by failing to order a new trial *sua sponte* after the government's closing argument.

## Conclusion

For the reasons discussed above, we affirm the district court's order denying Hinkson's motion for a new trial based on "newly discovered" evidence of the Miller and Woodring affidavits because the district court (1) applied the correct *Harrington* test, and (2) analyzed the *Harrington* factors in a manner that was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. We also hold the district court did not err by excluding the Dowling letter and Swisher's military file from evidentiary admission under Rule 403. Finally, we hold the district court did not plainly err by failing to order a new trial *sua sponte* after the government's closing argument.

**AFFIRMED.**

W. FLETCHER, Circuit Judge, dissenting, joined by
PREGERSON, WARDLAW, and PAEZ, Circuit Judges:

I dissent.

Following a two-week trial in federal district court in
Boise, Idaho, a jury convicted David Roland Hinkson of
soliciting the murder of three federal officials. The govern-
ment's star witness supporting the conviction was Elven Joe
Swisher. Wearing a Purple Heart lapel pin on the witness
stand, Swisher testified that he had told Hinkson that he was
a Korean War combat veteran and that Hinkson, impressed by
Swisher's military exploits, solicited him to kill the officials.

The government maintained in its opening statement to the
jury that Swisher was a Korean War combat veteran, and it
maintained throughout the trial that Hinkson's understanding
of Swisher's military exploits showed that he was serious in
his solicitations of Swisher. The government now concedes
that Swisher neither served in combat nor earned any personal
military commendations, and that Swisher presented a forged
military document in court and repeatedly lied under oath at
trial about his military record.

Hinkson makes three arguments on appeal. First, he argues
that the district court wrongly excluded documentary evi-
dence showing that Swisher presented a forged document and
lied on the stand. Second, he argues that the prosecutor
engaged in misconduct when he invoked Swisher's military
service in his closing argument despite having substantial rea-
son to suspect that Swisher had lied about that service. Third,
he argues that the district court abused its discretion in deny-
ing his motion for a new trial based upon his discovery after
trial of new evidence conclusively establishing that Swisher
had lied on the stand.

I would reverse the district court based on Hinkson's first
and third arguments. I would hold that the district court

abused its discretion when it excluded documentary evidence that would have contradicted Swisher's claim on the stand that he was a decorated combat veteran. I would also hold that the district court abused its discretion when it denied Hinkson's motion for a new trial. I would not reach Hinkson's second argument.

## I.  Background

The majority opinion recites some of the background facts relevant to Hinkson's appeal. In my view, however, the majority's recitation is too truncated. I begin by providing the background necessary to understand what went on during Hinkson's trial, and to understand why I believe the district court abused its discretion.

In an indictment filed on September 21, 2004, a federal grand jury in Idaho charged Hinkson with soliciting the murders of Assistant U.S. Attorney Nancy Cook, IRS Special Agent Steven Hines, and U.S. District Court Judge Edward J. Lodge. All three officials had been involved in the investigation and prosecution of Hinkson on tax and currency structuring charges. Hinkson appealed his conviction on those charges in a companion case. The three-judge panel of which I was a member affirmed that conviction in a separate memorandum disposition.

The superseding indictment in the case now before us contained eleven counts. Counts 1-6 charged that Hinkson, in violation of 18 U.S.C. § 373, sought to persuade an acquaintance named James Harding to murder Cook, Hines, and Lodge, first in January 2003 (Counts 1-3) and again in March 2003 (Counts 4-6). Counts 7-9 charged that in December 2002 or January 2003, Hinkson, again in violation of § 373, sought to persuade Swisher to murder Cook, Hines, and Lodge. Finally, Counts 10 and 11 charged that Hinkson, in violation of 18 U.S.C. § 115, personally threatened to kill the children of Cook and Hines.

Hinkson was convicted on only the Swisher-related counts, Counts 7-9. The jury acquitted Hinkson on Counts 1-3, 10, and 11, and deadlocked on Counts 4-6. This appeal involves only the Swisher-related counts.

At several points during Hinkson's trial, the prosecutor emphasized Swisher's military background, and Hinkson's understanding of that background, in an effort to show the seriousness of Hinkson's solicitations. In his opening statement to the jury on January 11, 2005, the prosecutor stated affirmatively that Swisher "was a Marine, a Combat Veteran from Korea during the Korean conflict. He was not adverse to this kind of violent, dangerous activity; but he wanted no part of murdering federal officials." However, during direct examination of Swisher three days later on January 14, the prosecutor did not ask Swisher whether he was, in fact, a Korean War combat veteran. Somewhat oddly, given his affirmative statement to the jury only three days earlier, the prosecutor asked Swisher only *what he had told Hinkson* about his military experience in Korea.

Swisher came to the witness stand wearing a replica of a Purple Heart on his lapel. A Purple Heart is an award given to members of the United States military who are wounded in combat. Swisher testified that he first became acquainted with Hinkson in 2000. According to Swisher, he had done some consulting work for Hinkson's company, WaterOz, and the two men had developed a friendship. Swisher testified that he had served in the Marine Corps. In response to the prosecutor's questions, he testified further that he discussed his military exploits with Hinkson on several occasions and told Hinkson that he had been in combat in Korea as a Marine. According to Swisher, Hinkson had asked whether he had ever killed anyone, to which Swisher said he had responded, "Too many."

Swisher testified that on various occasions in 2001 and early 2002, he and Hinkson discussed Hinkson's legal prob-

lems, particularly a civil suit brought against Hinkson by a former WaterOz employee. Swisher testified that shortly after April 2002, Hinkson expressed "considerable" anger toward the employee's lawyer, Dennis Albers, and spoke in graphic detail about wanting to see Albers and his family "tortured and killed." Swisher testified that Hinkson offered him "$10,000 a head to do it," but Swisher "told [Hinkson] he was out of his mind and he needed to knock that kind of BS off."

Swisher testified that in July or August of 2002, Hinkson began to focus on his problems with federal officials. According to Swisher, Hinkson stated that Cook and Hines "had been harassing him a great deal," "abused the judicial system," "cost him a lot of money," and "didn't deserve to live." Swisher testified that Hinkson asked him if he "remembered the offer he made regarding Mr. Albers and his family" and "said he wanted that done, basically, with Ms. Cook and her family and Mr. Hines and his family." Swisher testified that Hinkson told him, "I know you're used to it. I mean, you have killed people [while serving in the military]." Swisher testified that he replied that he would report Hinkson to the authorities if Hinkson "continue[d] talking that way."

Swisher testifed that after Hinkson was arrested on tax charges in November 2002, he had further conversations with Hinkson. According to Swisher, Hinkson "was extremely hostile to all of the people who had been involved in that arrest." In January 2003, Hinkson "went through the names of the people that had offended him, and added a federal judge by the name of Lodge to that list." Swisher testified that Hinkson then offered him "[a]t least $10,000 a head" to have "them all treated the way that the initial offer regarding Albers and his family had been handled" — that is, "[t]ortured and killed." Swisher testified that Hinkson spoke in a "pleading fashion" about how "he just had to have this done." Swisher replied that he "never wanted to hear that again." After the January 2003 exchange, the two men had a serious falling-out, eventually resulting in a lawsuit and a nasty feud. Swisher testified

that sometime after April 2003 he reported Hinkson's solicitations to a local Idaho prosecutor. At time of his testimony at Hinkson's trial in January 2005, Swisher was a bitter enemy.

On cross examination, defense counsel initially did not inquire into Swisher's military background. Instead, counsel sought to discredit Swisher by identifying inconsistencies in his testimony and by emphasizing the ongoing feud between Swisher and Hinkson. However, after having indicated that he had no further questions for Swisher, counsel asked to approach the bench. At the sidebar, he told the court, "For quite some time, [the defense has] been trying to dig into [Swisher's] military history." Counsel explained that, "[b]ecause of his age and because of the time of the war, we don't believe he was in the war. We also don't believe that he got a Purple Heart or was in combat." Counsel then told the court that he had just been "handed a letter from the National Personnel Records Center indicating that . . . the records fail to show that [Swisher] ever was recommended for or awarded any person[al] decorations." Defense counsel noted for the record that Swisher was "wearing a Purple Heart on the witness stand, in the presence of the jury."

Still at the sidebar, the prosecutor responded that he never asked Swisher about "winning medals or combat" and had merely asked about "a conversation that [Swisher] had with Mr. Hinkson and what Mr. Hinkson asked him about." The prosecutor did not mention that three days earlier, in his opening statement to the jury, he had affirmatively stated that Swisher was a combat veteran from the Korean War. The prosecutor also stated at the sidebar, "For the record, he has a little — I don't know — you know, something stuck in his lapel. If somebody knows what that is, fine. No one has said what it is."

The court permitted the defense to reopen its cross examination of Swisher in order to ask about Swisher's lapel pin and about his service during the Korean War. In response to

defense counsel's questions, Swisher testified that he was wearing "a Purple Heart Medal" that had been awarded to him by the U.S. government. He then explained that he had served in combat "[n]ot in the Korean War but following the Korean War." He said, "I was part of a special expedition, Marine Corps Expeditionary Unit that was engaged in combat after the Armistice, in an attempt to free POWs still in secret prison camps in North Korea. And that information still remains classified, so I'm not sure how much more I can say on that."

Over the prosecutor's objection, defense counsel then showed Swisher the just-received letter from the National Personnel Records Center. The letter was dated the day of the cross examination and had been faxed to defense counsel's office at 2:34 p.m. that afternoon. The letter was signed by Archives Technician Bruce R. Tolbert. The letter (hereinafter the "Tolbert letter") stated:

> [A] U.S. Marine Corps record was located on file at this Center for Mr. Swisher based on the information provided in your request. The USMC record shows Mr. Swisher served on active duty in the USMC from August 4, 1954 to his release from active duty on August 3, 1957. He was subsequently discharged from the USMC reserves on August 3, 1962. In addition, Mr. Swisher's Marine Corps record has been carefully examined by the Military Awards Branch of the office of the Commandant of the Marine Corps, and that office has stated that his record fails to show that he was ever recommended for, or awarded any personal decorations.

Defense counsel asked Swisher whether the letter "might refresh [his] recollection as to whether or not the Government issued [him] a Purple Heart."

After Swisher reviewed the letter, the following exchange took place:

Q [by defense counsel]: Now, sir, when you are awarded a Purple Heart, are you not given a document reflecting your entitlement to that Purple Heart?

A [by Swisher]: Commonly.

Q: Were you given such a document?

A: Yes.

Q: Where is that document?

A: In my pocket.

Q: May I see it, please?

A: I have a replacement DD-214, if the court will permit me to —

THE COURT: Let me take a look at it, first.

THE WITNESS: It is certified. We had to go clear to Headquarters of the Marine Corps and all over to get it. Because of the classifications, my record, along with the other survivors of that Mission, had been pretty much purged.

THE COURT: Ms. Longstreet, would you tender that to both counsel, please?

[THE PROSECUTOR]: I have a copy, Your Honor.

THE COURT: Just hang on to it.

[DEFENSE COUNSEL]: What was that?

[THE PROSECUTOR]: I have a copy.

[DEFENSE COUNSEL]: May we approach, Your Honor?

At sidebar, out of the hearing of the jury, the exchange continued:

[DEFENSE COUNSEL]: I am going to — apparently, counsel for the government knew about the validity of the Purple Heart. He just said he has a copy of this.

THE COURT: Have you seen this document?

[THE PROSECUTOR]: He showed me this document this morning, about 9:00 o'clock.

THE COURT: Do you have a copy of it?

[THE PROSECUTOR]: I have a copy of it.

[DEFENSE COUNSEL]: Why didn't you tell us?

[THE PROSECUTOR]: Why should I?

Swisher had pulled from his pocket a single sheet of paper, which was a photocopy of a document purporting to be a Defense Department Form 214, described by Swisher in his testimony as a "replacement DD-214." In box 32, near the bottom of the document, was typewritten: "This document replaces the previously issued transfer document of 8-3-57. Changes and additions have been verified by Command. The original of this DD-214 has been forwarded to headquarters MC (10-15-57) . . . Entitled to wear Marine Corps Expeditionary Medal." Near the middle of the document, in box 26, was typewritten: "SILVER STAR, NAVY AND MARINE CORPS MEDAL W/ GOLD STAR, PURPLE HEART, NAVY AND MARINE CORPS COMMENDATION MEDAL W/ BRONZE 'V'." In box 27, immediately below,

was typewritten: "Multiple shrapnel and gunshot — September 1955, Korea." The document bore the signature "W. J. WOODRING, Jr., Capt., USMC."

On the same page, below the photocopy of the purported Form DD-214, was written: "Filed and recorded at the request of Joe Swisher[.] At 2:40 o'clock p.m. this 2nd day of February 2004[.] *ROSE E. GEHRING*[,] Ex-Officio Auditor and Recorder Idaho County, Idaho[.] By Dana Stroop[,] Deputy[.] Fee $0[,] 1 pg." (Underlining indicates handwriting; italics indicates stamp; brackets indicate material added by me.)

The court excused the jury, and the conversation continued. The court asked the prosecutor to confirm that he had seen the document that morning at 9:00 a.m. The prosecutor replied:

> [Swisher] showed it to me at 9:00 a.m. this morning because I had asked — he had mentioned Korea, serving in Korea.
>
> I said, "Wasn't the Armistice in '52?"
>
> He said, "But there was still, you know, combat; and it continues to this day," which I happen to know to be true. There is combat to this day in Korea.

Defense counsel requested a mistrial based on the prosecutor's failure to inform the defense that Swisher had given the government a document that appeared to contradict the letter from the National Personnel Records Center. The prosecutor responded that defense counsel "should have listened to me when I said, 'Don't go there.' " He elaborated:

> I didn't go into anything about his combat or his medals or anything else on my direct. He chose to go down this path, even when I objected to it.

I didn't draw attention to the little pin in Mr. Swisher's lapel. Lots of people wear them. They could be anything. He wanted to make an issue of it.

. . .

Counsel whipped out his document that he received minutes ago. I believe he probably didn't have enough time to read it and digest it and tried to use that to impeach the witness. That was improper.

. . .

It was a grandstand play in front of the jury that didn't — that wasn't so grand, and he got caught on it. That's where we are.

There is nothing the Government did that caused him to go in the area he did. We tried to avoid going into this area.

I don't think — you know, I barely had time to look at this myself. It refers to other — that this replaces some document previously issued. I don't know what that document is, and it just led me to conclude that this is not a proper area to go into.

The court denied the motion for a mistrial, stating:

The court finds as a matter of fact that if [Swisher's document] is a copy of a genuine military record — and at this point, I don't have any way to determine that; but it appears to be genuine, at least in appearance.

It indicates consistently with how the witness has testified; that he did, in fact, receive multiple shrapnel and gunshot wounds in September 1955 in

Korea; and that he was awarded commendations and medals, including the Purple Heart.

The court stated that "until the receipt of the [Tolbert] letter," the government "had no reason to believe that [Swisher's document] was discloseable under Brady or Giglio because it was not impeaching."

The court offered to "instruct the jury to strike that portion of the cross examination of Mr. Swisher that relates to the Purple Heart. Just tell them to completely disregard all testimony about the Purple Heart." Defense counsel agreed. When the jury returned, the court said:

Ladies and gentlemen, it's been a long day; and I now realize that I made a mistake in allowing the questioning with regard to the Purple Heart Medal.

So I am going to instruct you to disregard completely all of Mr. Swisher's testimony with regard to that military commendation.

You are certainly entitled to consider all of the rest of his testimony. Just everything from where I asked [defense counsel] to re-open, please strike that from your minds; and you are not to consider it as evidence in the case.

The contretemps over the Tolbert letter and the "replacement DD-214" took place on Friday afternoon, January 14. The following Monday, January 17, was a federal holiday. When the trial resumed on Tuesday, the prosecution rested, and the defense called its first witnesses.

The next day, Wednesday, January 19, defense counsel told the court, outside the presence of the jury, that he had obtained information indicating that the document Swisher had taken from his pocket while on the witness stand — the

so-called "replacement DD-214" — was fraudulent. Defense counsel had obtained a photocopy of a different Form DD-214, also recorded by Swisher at the Idaho County Auditor and Recorder's office. However, this Form DD-214 had been recorded in February 2001 rather than February 2004. The earlier-recorded Form DD-214 was identical to the later-recorded form, with the notable difference that none of the medals, commendations, or wounds was mentioned in the earlier-recorded form. "N/A" was written in box 26 where the Silver Star, Purple Heart, and other awards were specified in the later-recorded form. "N/A" was also written in boxes 27 and 32 where, in the later-recorded form, "Multiple shrapnel and gunshot — September 1955, Korea" and "Entitled to wear Marine Corps Expeditionary Medal" were written.

Defense counsel told the court:

> [T]he indications from the people we have talked to [at the National Personnel Records Center] is that they stand by the [Tolbert] letter of January 14th and that they will provide us with a certified copy of his DD-214 that would not support [Swisher's document]; that [Swisher's document] is a forgery; and that he was never given any of the awards or benefits as indicated on [Swisher's document]; and that, further, if any change had been made in the discharge document, it would have been done on a form DD-215 [rather than a form DD-214] . . . .

Counsel further stated that he believed Swisher had not been wounded in combat but, in fact, had been "injured while in the Service in a car accident in Bremerton, Washington." He stated that the National Personnel Records Center would send Swisher's full military record to the court, but only in response to a subpoena signed by the court. The court signed a subpoena late that day.

Two days later, on Friday morning, January 21, again outside the presence of the jury, the prosecutor provided a photo-

copy of a letter to the court "for in-camera review." The letter was from Lieutenant Colonel K.G. Dowling, Assistant Head of the Military Awards Branch of the Marine Corps, to Ben Keeley of the Idaho Division of Veterans Services. The letter (the "Dowling letter") was dated December 30, 2004. What appeared to be a "received" stamp was dated January 10, 2005. At the top of the Dowling letter, now in the possession of the government, was a fax line indicating that it had been faxed from the "ID. STATE VETERANS SVS" in Lewiston, Idaho, where Keeley's office was located, on Thursday, January 13, 2005. January 13 was the day before Swisher took the stand to testify against Hinkson.

The prosecution has given various answers about when it received the Dowling letter or learned of its existence. On the morning of January 21, when he gave the letter to the district court, the prosecutor stated that he "believe[d] Agent Long got [the letter] the day before by going to the Veterans' Administration." Later, in its opposition to Hinkson's motion for a new trial, the prosecution stated in its brief that the letter was "obtained by federal investigators a few days earlier from the Boise Veteran's Affairs office." In its brief to this court, the prosecution stated that "government investigators obtained [the letter] on or about January 20." Finally, in response to the queries during oral argument before the three-judge panel, the government's attorney sent a post-argument letter stating that he had "been informed that investigating agents on the prosecution team first saw and learned of the Dowling letter on January 18 or 19, at the Boise, Idaho office of the Department of Veteran's Affairs." There is no indication in the record that defense counsel had any idea of the existence of the Dowling letter until the government provided it to the court on January 21.

The Dowling letter indicated that Keeley earlier had contacted the Personnel Management Support Branch of Marine Corps Headquarters, after Swisher attempted to use his "replacement DD-214" to obtain veterans' benefits from the

Idaho Division of Veterans Services. Dowling wrote back to Keeley:

> We have thoroughly reviewed the copy of the Certificate of Release or Discharge from Active Duty (DD Form 214) and supporting letter which you submitted on behalf of Mr. Swisher with your request. The documents you provided do not exist in Mr. Swisher's official file. The official DD Form 214 in his record of the same date was signed by Mr. Swisher and does not contain any awards information in box 26, and contains no "wounds" information in box 27. A copy of his official DD 214 is provided as the enclosure. Given this information we have reason to believe that the documents you submitted are not authentic.
>
> Specifically, the DD 214 you submitted on behalf of Mr. Swisher indicates that Mr. Swisher is entitled to the Silver Star Medal, Navy and Marine Corps Medal (Gold Star in lieu of the Second Award), Purple Heart, and Navy and Marine Corps Commendation Medal with Combat "V." However, our review of his official military records, those of this headquarters, and the Navy Department Board of Decorations and Medals failed to reveal any information that would indicate that he was ever recommended for, or awarded any personal decoration.
>
> Additionally, the Navy and Marine Corps Commendation Medal, which is listed in block 26 of the DD 214 that you submitted did not exist at the time of Mr. Swisher's transfer to the Marine Corps Reserve in 1957. On March 22, 1950, a Metal Pendant was authorized for issue in connection with a Letter of Commendation and commendation ribbon. On September 21, 1960, the Secretary of the Navy changed the name of the award to the Navy Com-

mendation Medal. On August 19, 1994, the Secretary of the Navy renamed the medal as the Navy and Marine Corps Commendation Medal. It is impossible that the approving officer could have signed an official document in 1957 indicating Mr. Swisher's entitlement to a personal decoration which did not exist in its present form until 1994.

Further review of Mr. Swisher's records reveals that he is not entitled to any service awards, including the Marine Corps Expeditionary Medal, for his service in the U.S. Marine Corps. Mr. Swisher's official military records failed to indicate any information that he served in Korea during the period when any awards were authorized. His records show that he was stationed at Camp Fuji and Yokosuka, Japan from March 4, 1955 to May 6, 1956.

There is no information in his military record or his medical record to substantiate his entitlement to a Purple Heart medal. His medical records show that on February 10, 1957, he was involved in a private vehicle accident near Port Townsend, Washington.

Later on Friday, January 21, the court received Swisher's official military file — "a half-inch-thick stack of materials" — from the National Personnel Records Center in response to its subpoena. The official military file contained a copy of the Dowling letter. The government undoubtedly anticipated that the file would arrive on or about that day, and that when it arrived it would contain the Dowling letter that the government had presented to the court that morning. The presence of the Dowling letter in the file was entirely predictable, for it stated in its last paragraph: "[Mr. Swisher's] records will be returned to the National Personnel Records Center, and a copy of this letter will be filed in Mr. Swisher's official military records."

Swisher's official military file also contained a copy of Swisher's original Form DD-214. This Form DD-214 matched precisely the Form DD-214 that Swisher registered in the Idaho County Recorder's office in February 2001. This Form DD-214 showed that Swisher had never received any military awards.

Swisher's official file also contained the two documents that Keeley had sent to Dowling for evaluation. One of the documents was a copy of the "replacement DD-214" purportedly signed by Capt. W. J. Woodring, Jr. that Swisher had pulled out of his pocket on the witness stand. The other document was a letter purportedly written to Swisher by Woodring on October 16, 1957. That letter stated:

> I am pleased to inform you that your combat action, awards and citations have been verified. A copy of a replacement DD 214 transfer document, which more accurately reflects your military service, is attached to this correspondence. The original has been forwarded to the Commandant of the Marine Corps at Headquarters Marine Corps in Washington, D.C.
>
> . . .
>
> When you recover from surgery, both Major Morgan and I encourage you to enter a R.O.T.C. program at the college of your choice. Glad we were able to help.

As indicated above, the Dowling letter stated that "we have reason to believe" that both of these documents "are not authentic."

Outside the presence of the jury, the court stated — somewhat surprisingly in view of the contents of the file — that a "quick review of the file indicates that Mr. Swisher was, in

fact, involved in top secret activities; and it appears that he was awarded the medals that he claims that he was awarded. . . . [The documents] do not appear to be impeaching." The court told counsel that it would conduct a more thorough review of the file over the weekend.

When the trial reconvened on Monday, January 24, the court discussed Swisher's official military file with counsel off the record. Then, on the record and without the jury present, the court stated its conclusions. The court stated that the file had been sent to the court by the National Personnel Records Center in response to the court's subpoena; that the Dowling letter in the file matched the letter provided to the court by the prosecution on Friday; and that the Dowling letter concluded that the "replacement DD-214" and the "supporting letter" purportedly signed by Woodring were "not authentic." But the court stated that it found the file "very difficult to decipher." The court stated:

> It is not at all clear to me what the truth of the matter is; and I suspect it has something to do with the fact that we are dealing with events that occurred fifty years ago and that, at the time that they occurred, were involving top secret military activities.
>
> So I wanted you to look at it because, obviously, you have to make your own judgment as to what you think the significance of it is.

The court stated that "the problem the court had in reviewing the documents in camera is that the documents we have, themselves, are neither self-authenticating nor self-explanatory."

The court concluded:

And I do not want to turn this issue into a periph-
eral mini-trial under Rule 608(b) of the Rules of Evi-
dence.

. . .

So the state of the record at this point before the
jury is that the jury is not to consider Mr. Swisher's
battlefield commendations, or lack thereof, although
they can certainly assess his credibility with regard
to the extensive cross-examination that was con-
ducted by the defense and see how it jives with all
of the other evidence in the case.

Defense counsel replied that, in light of the information now
before the court, the defense deserved an opportunity to ques-
tion Swisher further about his "replacement DD-214" and his
military experience. Defense counsel reiterated that Swisher
had worn a Purple Heart on the witness stand.

**Volume 2 of 2**

The prosecutor reminded the court that during his direct examination of Swisher he had not attempted to elicit "for the truth of the matter that Swisher was, indeed, in combat." Instead, he said, the jury heard about "a conversation . . . between Mr. Swisher and Mr. Hinkson regarding Hinkson asking him, 'Were you ever in combat?' " The prosecutor also addressed "what we call a Replica Purple Heart. It's not a real Purple Heart at all." The basis of the prosecutor's conclusion that the lapel pin Swisher wore on the witness stand was "not a real Purple Heart at all" is not clear from the record. The prosecutor maintained to the court that, in any event, whether Swisher was "entitled to wear a Replica Purple Heart or any other kind of little medal on his lapel" was a "collateral issue that arose only on cross-examination."

Defense counsel told the court that he was "concerned about when the Government got [the Dowling letter]," which the prosecutor had provided to the court on Friday morning, January 21. The prosecutor responded, "[W]e got it — I believe Agent Long got it the day before by going to the Veterans' Administration." The prosecutor added that the Dowling letter, standing alone, did not prove that Swisher's "replacement DD 214" was fraudulent. He said:

> What they would really have to prove, if this were to be resolved, is they would have to prove that the substitute DD-214 signed by Captain Woodring, in, I believe, October '57 — . . . that the signature of Captain Woodring was forged; and I would suggest that probably would resolve whether it's correct or not.

> How you would prove that something that was signed in 1957 — I doubt very much Mr. Woodring is still with us, but I don't know.

The court agreed that it "was not at all convinced yet" that "the document that Mr. Swisher pulled out of his pocket [was]

false or not" because Swisher's military record was not "self-explanatory." The court stated, "I have no idea, if somebody is involved in secret military operations, whether or not their personnel file . . . would ever reflect those missions." The court stated that it needed to hear from "a records custodian from the National Personnel Records Center or someone else who is more familiar with military records and decorations than any of us."

The court ruled that the defense would be permitted to recall Swisher for further cross examination but would not be permitted to introduce into evidence any of the documents bearing on his military experience. That is, the court ruled that the defense would not be permitted to introduce the Tolbert letter, the Dowling letter, or anything else contained in Swisher's official military file that had been sent in response to the court's subpoena. The court stated:

> The documents which form the basis for the doubt cast on Swisher's military record and [his] entitlement to wear the Purple Heart are extrinsic evidence probative of a specific incident of untruthfulness.

> The court therefore holds that the admission of these documents is barred by Rule 608(b).

> . . .

> Furthermore, the court holds that admission of the actual documents of impeachment is barred under Rule 403.

> First, the documents have not yet been officially authenticated; and this process could waste considerable time on tangential issues only indirectly related to the issues to be resolved at trial and, perhaps, submitted to the jury as early as tomorrow.

> Second: The documents themselves are not
> entirely conclusive. They are certainly not self-
> authenticating. The Government would have to be
> allowed to introduce conflicting documents or testi-
> mony of military officers to explain them.
>
> The proffered documents state, in summation, that
> Swisher's record does not indicate that he earned any
> service record or service medals during his military
> duty; however, other documents available to the
> court suggest that Swisher might, indeed, have
> earned such medals.
>
> . . .
>
> The defense may reference these documents dur-
> ing its cross-examination . . . .
>
> In sum, the court finds that the questionability of
> Swisher's character for truthfulness may be amply
> demonstrated to the jury by re-opening cross-
> examination and by allowing the defense to refer-
> ence the impeaching documents during the cross-
> examination.
>
> . . . .
>
> I will let the defense decide which way they want
> to go; either leave it alone or call him.

The next morning, Hinkson's counsel informed the court that, given his inability to introduce into evidence the military documents showing that Swisher had lied on the stand about receiving the Purple Heart and other decorations, he had decided not to recall Swisher.

The government made several references to Swisher's military experience during closing arguments to the jury. The

prosecutor began by explaining the significance of Swisher's testimony:

> The judge will further instruct you that the fourth sort of circumstance that you can consider to be strongly corroborative of Mr. Hinkson's intent to solicit murder would be the fact that an accused believed or was aware that the person solicited had previously committed similar offenses.
>
> Mr. Swisher's testimony was powerful. He talked about how Mr. Hinkson understood that Mr. Swisher had been in the military and had killed a lot of people. He was very impressed by that.
>
> In fact, according to Mr. Swisher, Mr. Hinkson asked, "Have you killed somebody?"
>
> And when Mr. Swisher says, "Yes," Mr. Hinkson's response is not, "Wow, that must be terrible," but it is, "How many people have you killed?" He was very impressed by that.

The prosecutor stated that "[a]nother reason Mr. Hinkson liked Joe Swisher and they were friends is Mr. Swisher had been in the Marine Corps. Mr. Hinkson had served in the Navy. Joe Swisher told you they talked about their experiences in the Service." The prosecutor stated later, "Mr. Swisher, I suggest to you a reasonable juror could find, told the truth about the solicitation." At the end of the government's closing, the prosecutor stated that Hinkson "understood Mr. Swisher had a military record and that he had served in combat and killed people. It's the kind of person he thinks will do such a thing."

On January 27, 2005, after two days of deliberations, the jury returned a guilty verdict on the Swisher-related solicitation counts. It acquitted or hung on all other counts.

On March 3, 2005, just over a month later, defense counsel moved for a new trial under Federal Rule of Criminal Procedure 33. The motion relied on, *inter alia*, "newly discovered evidence" that Swisher had lied under oath on the witness stand and had produced a forged document in court. That evidence consisted of a newly obtained affidavit from Chief Warrant Officer W.E. Miller, the Marine Corps liaison to the National Personnel Records Center, and a newly obtained affidavit from now-retired Colonel W.J. Woodring, Jr., the Marine Corps officer whose signature appeared on Swisher's original Form DD-214, on the purported "replacement DD-214," and on the purported "supporting letter" for the "replacement DD-214." These documents were precisely what the district court and the government had said were needed to prove that Swisher had lied on the stand.

Chief Warrant Officer Miller stated, in an affidavit dated February 24, 2005, "As part of my duties . . . I have access to the official United States military records of former members of the USMC which are deposited in the N[ational] P[ersonnel] R[ecords] C[enter] and, among my other responsibilities, I evaluate the authenticity of information, records and documents affecting individual Defense Department transfer documents including DD Forms 214."

Miller concluded that Swisher had never been awarded a Purple Heart. He wrote that his reasons included the following:

    A.   Swisher's medical records show that he did not sustain any combat wounds, rather he was involved in a private motor vehicle accident near Port Townsend, Washington on 10 February 1957 and was treated at the hospital at Bremerton, Washington. . . .

    B.   The DD Form 214 signed by Swisher on 3 August 1957 . . . which is a part of his official

U.S. military record contains a specification that he was not entitled to VA benefits[.]

C.   Swisher's official U.S. military record indicates that he was subject to an Article 115 disciplinary action resulting in demotion from Corporal to Private First Class on 28 Feb. 56 which involved disobedience to military law during his active tour of duty[.]

D.   Swisher's official U.S. military record shows that rather than being assigned to missions in post-War Korea (as claimed by Swisher) he was stationed at Camp Fuji and Yokosuka, Japan from 4 March to 6 May 1956 with no supporting documentation or information to indicate that he participated in any classified Marine Corps expeditionary operation that performed incursions into Korea during his tour of active duty. . . .

E.   Swisher asserts that the expeditionary missions he was involved with in Korea were classified as "Top Secret" operations. The U.S. Marine Corps did not perform any classified operations or "Top Secret" operations during Swisher's tour of duty.

Miller also concluded that the "replacement DD-214" that Swisher had presented in court was not an "authentic document." (Miller referred to this document as "Exhibit C.") In addition to the factors enumerated in support of his conclusion that Swisher was not entitled to a Purple Heart, Miller wrote:

A.   Military Rules and Procedures require that a DD Form 214 can only be issued and retyped at the Headquarters of the USMC and signed by a

designee of the Commandant of the Marine Corps who offices at Headquarters. Capt. Woodring never held such designation.

B.   Exhibit C, in box 32 provides: "*[t]his document replaces the previously issued transfer document of 8-3-57*." There are no additional records in Swisher's file that support the claim that Swisher's original DD Form 214 was replaced;

C.   Exhibit C, box 32, provides: "*[c]hanges and additions have been verified by Command*." Changes or additions in Swisher's original DD Form 214 if truly "*verified by Command*" would have resulted in verification documents becoming a part of Swisher's official U.S. military record . . . .

       . . .

G.   Military policy and procedure which has been in effect since before the time of Swisher's transfer from active duty to the USMC Reserves on 3 Aug. 57 would have directed the issuance of a DD Form 215 first, before any replacement version of Swisher's original DD Form 214 would have been issued . . . .

H.   There is no record of a DD Form 215 ever having been issued for Swisher.

(Emphasis and brackets in original.)

Now-retired (and, to the government's suprise, still living) Marine Corps Colonel W.J. Woodring, Jr., in an affidavit dated February 27, 2005, stated:

2.   I spent 35 years 6 months in the United States Marine Corps. I was a Captain in the Marine

Corps in 1957. I am now retired and I reside in Southern California.

3. I have reviewed Exhibit A attached which purports to be a copy of a letter addressed to Pfc Elven Joe Swisher (Swisher) dated 16 Oct 1957. I did not write or cause Exhibit A to be written. Below the words Semper Fidelis, there is handwriting that purports to be my signature. I did not sign Exhibit A. What looks like my signature on Exhibit A is actually the image of my signature that has somehow been superimposed upon the letter. Exhibit A is a forgery.

4. I have reviewed Exhibit B attached which purports to be a copy of a "Replacement DD 214" for Swisher. In box 34b there is handwriting that purports to be my signature. I did not sign Exhibit B. What looks like my signature on Exhibit B is actually the image of my signature that has somehow been superimposed upon the letter. Exhibit B is a forgery.

On April 22, 2005, the court denied Hinkson's motion for a new trial. Applying the criteria set forth in *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003), the court gave several reasons for declining to grant a new trial on the basis of Hinkson's newly discovered evidence. First, the court concluded that Hinkson had not been diligent in seeking the evidence he now submitted to the court. Second, the court concluded that the evidence was not "newly discovered" because "[t]he substance of both proffered documents is not new and is generally cumulative of previously available information." Finally, "[m]ost importantly," the court concluded that "the proffered 'new' evidence is not material to the issue at trial, nor would a new trial probably result in an acquittal, because the evidence is inadmissible." The court explained that it had "previously held on the record at trial . . . and now

reiterates, admission of the proffered documents and testimony is still prohibited by Fed. R. Evid. 608(b), which bars introducing extrinsic evidence of the witness's past conduct."

Hinkson was sentenced on June 3, 2005, for his solicitation convictions as well as for his tax evasion and currency structuring convictions. He received a total of 43 years in prison: ten years on the tax and structuring charges, ten years on each of the three solicitation charges, and an additional three years for having made the solicitations while on pretrial release in the tax case.

## II.   Subsequent Indictment and Conviction of Swisher

On July 30, 2007, the government indicted Swisher for knowingly wearing military decorations to which he was not entitled, including the Purple Heart, in violation of 18 U.S.C. § 704(a); for willfully and knowingly making false representations about his military service in order to obtain benefits to which he was not entitled, in violation of 18 U.S.C. § 1001(a)(2); and for presenting false testimony and a "forged form DD-214" in order to obtain benefits to which he was not entitled, in violation of 18 U.S.C. §§ 641 and 642. As the date of the indictment makes clear, the government indicted Swisher more than two years after the district court ruled on Hinkson's motion for a new trial. On April 11, 2008, Swisher was convicted on all three counts of the indictment. Because Swisher's indictment and conviction did not occur until after the district court ruled on Hinkson's motion for a new trial, the district court obviously could not have considered them in reaching its decision.

## III.   Appeal

On appeal to this court, Hinkson challenges the denial of his motion for a new trial on three grounds. First, Hinkson argues that the district court erred in precluding him from introducing into evidence the military documents that would

have shown that Swisher lied about his Purple Heart, about his other decorations, and about his forged "replacement DD-214." Second, Hinkson argues that the prosecution engaged in misconduct by referring to Swisher's military background during its closing argument after it was clearly on notice of the contents of Swisher's official military file. Third, Hinkson argues that he is entitled to a new trial based on the new evidence presented in his post-trial motion under Rule 33. I would reach only the first and third arguments. I agree with both of those arguments and would reverse the district court based on either of them.

A.  Refusal to Admit Impeaching Military Documents into Evidence

We review for abuse of discretion a district court's evidentiary rulings, including decisions to admit or exclude impeachment evidence. *United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009); *United States v. Geston*, 299 F.3d 1130, 1137 (9th Cir. 2002). We must then apply the harmless error standard. We will reverse an evidentiary ruling for abuse of discretion "only if such nonconstitutional error more likely than not affected the verdict." *United States v. Edwards*, 235 F.3d 1173, 1178-79 (9th Cir. 2000); *see also* Fed. R. Crim. P. 52(a) ("Harmless Error. Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

Hinkson sought to introduce the Tolbert letter, the Dowling letter, and the rest of Swisher's official military file in order to show that Swisher lied about receiving the Purple Heart and his other claimed military decorations, and to show that he had forged his so-called "replacement DD-214" that he had brandished before the jury. The district court excluded this evidence based on Federal Rules of Evidence 608(b) and 403.

Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The district court deemed the documents bearing on Swisher's military experience "extrinsic evidence probative of a specific incident of untruthfulness" and therefore inadmissible under Rule 608(b).

The district court erred as a matter of law in holding that the Tolbert letter, the Dowling letter, and the other documents in Swisher's file could be excluded under Rule 608(b). The 2003 Advisory Committee Notes to Rule 608 make clear that "the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness." Fed. R. Evid. 608(b), advisory comm. notes (2003). Hinkson did not seek to introduce those documents for the sole "purpose of attacking . . . the witness' character for truthfulness." Rather, Hinkson sought to introduce the documents for the specific purpose of contradicting in-court testimony by Swisher. Such evidence is governed by Rule 607, which "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999).

Swisher took the witness stand wearing a Purple Heart lapel pin, thereby affirmatively stating that he had been wounded in combat while serving in the United States armed

forces. Rule 801(a) provides, "A 'statement' is . . . nonverbal conduct of a person, if it is intended by the person as an assertion." Recall that in his opening statement to the jury three days before, the prosecutor had described Swisher as "a Combat Veteran from Korea during the Korean conflict [who] was not adverse to . . . violent, dangerous activity." Particularly given the prosecutor's statement, the jury could hardly avoid understanding Swisher's wearing of the Purple Heart as "nonverbal conduct . . . intended . . . as an assertion" that he had been wounded in military combat. The documents Hinkson sought to introduce would have directly contradicted that statement, and would have shown Swisher to be a liar.

The district court also erred by refusing to allow Hinkson to introduce this extrinsic evidence to impeach Swisher based on Rule 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The district court abused its discretion by concluding that it would be unduly time-consuming and confusing to the jury to admit the official military documents showing that Swisher lied about receiving a Purple Heart, and that, when challenged, he lied about having a so-called "replacement DD-214." Although some parts of Swisher's military record may have been difficult for a lay jury to understand, other parts were easy to comprehend. For example, the Dowling letter was clearly written and unambiguous. It stated simply and directly that Swisher had not been in combat and had not been awarded any medals. Other documents in Swisher's official military file — which had been sent to the court pursuant to its subpoena and whose authenticity was not in doubt — unambiguously showed that Swisher's "replacement DD-214"

was a forgery. Given Swisher's crucial role in the government's case against Hinkson, the time it would have taken to admit this evidence could hardly have outweighed its probative value.

The district court's refusal to allow Hinkson to admit this documentary evidence was not a harmless error. Swisher was the government's principal witness on the only counts on which Hinkson was convicted. The jury would have formed a significantly different impression of Swisher's credibility if Hinkson had been permitted to introduce evidence that Swisher lied about his military record on the stand. For the reasons I describe in detail below, this would have called into serious doubt all of Swisher's testimony, including his statements describing his interactions with Hinkson.

### B.   New Evidence Produced in Support of Motion for New Trial

Hinkson's motion for a new trial asserted that the Miller and Woodring affidavits, newly obtained after trial, proved conclusively that Swisher had presented false testimony and had presented a forged document during trial. The government no longer disputes that Swisher lied about his military experience and presented a forged "replacement DD-214." It contends, however, that the newly obtained Miller and Woodring affidavits do not warrant a new trial.

We review for abuse of discretion a district court's denial of a motion for a new trial based upon newly discovered evidence. *See, e.g.*, *United States v. Sarno*, 73 F.3d 1470, 1507 (9th Cir. 1995). A district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with "a definite and firm conviction that the district court committed a clear error of judgment." *Delay v. Gordon*, 475 F.3d 1039, 1043 (9th Cir. 2007) (internal quotation marks omitted).

Under *United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005), a criminal defendant must satisfy a five-part test in order to prevail on a motion for a new trial:

> "(1) [T]he evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal."

*Id.* at 601 (quoting *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991)). The district court applied this *Harrington* test, citing *Waggoner*, 339 F.3d at 919.

What we today call the *Harrington* test is sometimes referred to as the "*Berry* rule," named for the nineteenth-century case from which it derives. *See* 3 Charles Alan Wright et al., *Federal Practice and Procedure* § 557, at 541 (3d ed. 2004) (citing *Berry v. State*, 10 Ga. 511, 527 (1851)). Although we ordinarily state the test as comprising five requirements, we have recognized that requirements (3), (4), and (5) are duplicative. That is, newly discovered evidence is "material" when the result of the newly discovered evidence is that "a new trial would probably result in acquittal," a condition that is not usually met when the newly discovered evidence is "cumulative [ ]or merely impeaching." *See, e.g.*, *United States v. Krasny*, 607 F.2d 840, 845 n.3 (9th Cir. 1979) (noting that the materiality and probability requirements "are really two means of measuring the same thing"); *United States v. Davila*, 428 F.2d 465, 466 (9th Cir. 1970) (per curiam) (noting that newly discovered impeachment evidence supports a new trial if "it is likely that the jury would have reached a different result" in light of the evidence); *see also* Wright et al., *supra*, § 557, at 552.

The character of the defendant's newly discovered evidence determines how strictly we apply the *Harrington* probability requirement. Our usual rule is that newly discovered evidence does not entitle a defendant to a new trial unless the evidence indicates that it is more probable than not that the new trial will result in acquittal. This rule applies to most newly discovered evidence, including newly discovered evidence tending to show that evidence presented at the defendant's trial was false. *See Krasny*, 607 F.2d at 842.[1]

I would conclude that Hinkson has satisfied all five parts of the *Harrington* test. To my surprise, the majority concludes that Hinkson has satisfied *none* of them.

### 1.   Newly Discovered Evidence

Under the first part of the *Harrington* test, we must determine whether the evidence presented in support of the motion for a new trial is "newly discovered." Hinkson's new trial motion relied on two new pieces of evidence: (1) the affidavit from Chief Warrant Officer Miller, the Marine Corps liaison to the National Personnel Records Center; and (2) the affidavit from Colonel Woodring, the officer whose purported signature appeared on Swisher's "replacement DD-214" and "supporting letter." It is undisputed that neither piece of evidence was known to, or was in the possession of, the defense until after Hinkson's trial had concluded.

The majority concedes that both the Miller and Woodring affidavits are "newly written" evidence, but it contends that the affidavits "did not provide any new *information* that was

---

[1]We have sometimes applied a less demanding standard for granting a new trial where it is known conclusively at the time of the new trial motion that the evidence presented at trial was false. *See Hall v. Dir. of Corr.*, 343 F.3d 976 (9th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002); *United States v. Young*, 17 F.3d 1201 (9th Cir. 1994). Because I would hold that Swisher is entitled to a new trial under the *Harrington* test, it is unnecessary to apply this test.

not already considered and rejected from evidentiary admission by the court." Maj. Op. at 14981. In other words, the majority concludes that the evidence contained in the documents is merely cumulative of evidence that was already known during trial. That argument is best addressed to the third *Harrington* requirement, and I address that argument in detail below. I respond only briefly here.

The majority's conclusion would be more persuasive if the district court had not indicated clearly during trial that, in its view, the evidence then before it was insufficient to show that Swisher had lied about his military record. After reading the half-inch-thick file received on January 21 from the National Personnel Records Center, which included the Dowling letter, the district court stated, "It is not at all clear to me what the truth of the matter is." The court indicated that the file was "very difficult to decipher" and not "self-explanatory." The court stated that it could not resolve its uncertainty without "hearing from" a military "records custodian" or similar person. The prosecutor added that what was needed in order to show the falsity of the "replacement DD-214" was an affidavit from Colonel Woodring stating that his signature had been forged.

As I will discuss in more detail below, the newly provided Miller and Woodring affidavits were precisely the evidence that the district court and the prosecutor on January 21 had described as fatally lacking. If the district court had not explicitly stated that evidence of the sort provided by the Miller and Woodring affidavits was needed to "decipher" Swisher's file and to determine the truth, the majority's conclusion that this evidence is merely cumulative might be understandable. But the district court's explicit statement that it needed precisely this evidence makes it is impossible to conclude that the "substance" of the Miller and Woodring affidavits was not new.

## 2.  Diligence

Under the second part of the *Harrington* test, we ask whether the failure to discover the evidence sooner resulted from a "lack of diligence on the defendant's part." *See Kulczyk*, 931 F.2d at 548. A court cannot conclude that a defendant lacks diligence merely because a defense team with unlimited time and resources might have managed to discover the evidence sooner. Instead, a court must ask whether it was unreasonable for the defense to have failed to discover the evidence more promptly. "All that is required is ordinary diligence, not the highest degree of diligence." 3 Wright et al., *supra*, § 557, at 559-60.

The district court concluded that Hinkson had not been sufficiently diligent in discovering the new evidence. It wrote, "[T]he Court finds that Defendant is unable to establish that the failure to discover this evidence was not due to his counsel's lack of diligence. . . . [T]he Court finds that defense counsel had ample time to investigate Swisher's record prior to trial, but was not diligent in pursuing the issue."

In support of its conclusion that Hinkson had not been diligent, the district court pointed out that Swisher had testified to receiving "battlefield injuries" from his military service during an October 11, 2004, deposition in a civil suit involving Swisher and Hinkson. Hinkson was represented in that suit by Wesley Hoyt, one of the two attorneys representing him in his criminal case. In further support of its conclusion, the district court pointed out that Swisher had discussed his purported war injuries even before the deposition, during his grand jury testimony on April 16, 2002, and February 10, 2004.

Swisher's deposition in the civil case took place just three months before the start of Hinkson's criminal trial. That was the first time Hinkson was put on notice of Swisher's claimed "battlefield injuries."

It is true, as the district court wrote, that Swisher gave grand jury testimony in 2002 and early 2004. But this meant only that the *government* knew about Swisher's grand jury testimony, and thus the *government* was put on notice in 2002 and 2004 of his claimed "battlefield injuries." As the district court knew or should have known, precisely because it was grand jury testimony, that testimony was kept secret from Hinkson. The government finally turned Swisher's grand jury testimony over to Hinkson pursuant to the Jencks Act on January 4, 2005, only one week before trial.

Thus, the first time Hinkson was put on notice of Swisher's claimed battlefield injuries was on October 11, 2004. On January 14, 2005, when Hinkson's counsel sought to reopen his cross examination of Swisher in order to question him about the Tolbert letter, counsel stated to the court, "For quite some-time [sic], we have been trying to dig into his military history because we don't believe it's accurate." Then, after Swisher pulled the "replacement DD-214" out of his pocket, Hinkson's counsel stated at the sidebar that the defense had "been trying to get Mr. Swisher's military records *for about ninety days*; and we have very little control over when that happens." (Emphasis added.) January 14 is ninety-five days after October 11.

Thus, we know from the uncontradicted trial transcript that Hinkson's counsel tried to obtain Swisher's military record immediately after his October 11 deposition. We also know that government authorities, over whom defense counsel had "very little control," were slow to respond. The government did not provide anything to Hinkson until it provided the Tolbert letter on the very day of Swisher's testimony. The government can hardly claim that Hinkson was not diligent when his counsel sought the information immediately after Swisher's October 11 deposition, and it was the *government* that took ninety days to respond.

In my view, Hinkson's counsel were diligent in looking for evidence that could be used to impeach Swisher. Indeed, they

were successful in finding such evidence. As a result of their efforts, defense counsel received the Tolbert letter from the National Personnel Records Center while Swisher was still on the stand. The letter recounted that Swisher did not enter active duty until 1954. It stated that "Swisher's Marine Corps record has been carefully examined by the Military Awards Branch . . . , and that office has stated that his record fails to show that he was ever recommended for, or awarded any personal decorations."

Hinkson's counsel reasonably viewed the Tolbert letter as exactly the sort of impeaching evidence it had been seeking. Counsel hoped that Swisher, when confronted with the letter, would be forced to admit that he was not the decorated combat veteran he purported to be. Counsel could hardly have anticipated that Swisher, after being shown the letter, would pull from his pocket a forged document purporting to provide a superseding account of his military service. Until that moment, there was little reason for the defense to suspect the existence of Swisher's "replacement DD-214," let alone to suspect that the document was a forgery.

After learning of the "replacement DD-214" on Friday, January 14, the defense was quick to investigate its authenticity. On Wednesday, January 19, following a long holiday weekend, defense counsel informed the court that they had learned that Swisher had recorded two different DD-214 forms with Idaho County, and that the earlier-recorded DD-214 was "devoid of any . . . honors and medals." Counsel also stated that they had spoken to staff at the National Personnel Records Center who stated that the Center stood by the conclusions of the Tolbert letter but would not release additional documents about Swisher without a subpoena from a judge. The court agreed to subpoena Swisher's military file, which arrived two days later, on Friday, January 21.

The court kept Swisher's military file to review over the weekend, and then disclosed it to counsel on Monday, Janu-

ary 24, the last full day of testimony before closing arguments. The court ruled that it would allow the defense to recall Swisher for further cross examination, but would not allow the defense to introduce into evidence any of the military documents obtained. The court stated further that it did not want to conduct a mini-trial during which the government would put experts on the stand to explain the documents. Once Hinkson's trial concluded, the defense was diligent in obtaining the evidence from Woodring and Miller. It filed its motion for a new trial just over one month after the conclusion of trial. *See* Fed. R. Crim. P. 33(b)(1) (providing that motions for a new trial "grounded on newly discovered evidence must be filed within 3 *years* after the verdict" (emphasis added)).

The government had its own duty to investigate Swisher's military record, having been alerted to "the real possibility of false testimony." *Commonwealth of N. Marina Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001). Because the government had participated in the grand jury proceedings, it knew long before Hinkson's counsel that Swisher had given potentially false testimony about his military experience. Swisher's first grand jury testimony was in April 2002. This was two years and three months before Swisher's deposition, and two years and sixth months before Hinkson's trial. During this period, if it had wished to do so, the government could easily have obtained Swisher's official military file to determine whether its star witness was telling the truth. But so far as the record shows, the government made no effort to do so.

The government now argues that Hinkson was not diligent in investigating Swisher's military record. But for two and a half years, it was the *government* that made virtually no effort to investigate the trustworthiness of its star witness. Further, it was the *government* that took ninety days to respond to Hinkson's request immediately after Swisher's October 11 deposition for information about his military record. Yet the government now has the nerve to argue that it was *Hinkson*

who was not diligent. It is almost incomprehensible to me that the government would make that argument. It is entirely incomprehensible that the majority would accept it.

### 3.   Material to the Issues at Trial

The third part of the *Harrington* test requires that the newly discovered evidence be "material to the issues at trial." In the context of a new trial motion under *Harrington*, materiality has a special meaning. Materiality under *Harrington* does not require that the evidence in question would have been material at the original trial. Rather, materiality under *Harrington* requires that the evidence in question will materially alter the result on *retrial*. In many cases, there will be little or no practical difference. *See, e.g.*, *United States v. George*, 420 F.3d 991, 1001 (9th Cir. 2005) (analyzing materiality in terms of the first trial). But the *Harrington* test is clearly framed in terms of what will happen on retrial rather than what happened at the original trial. *See Harrington*, 410 F.3d at 601 ("[T]he evidence must indicate that a new trial would probably result in acquittal."); *see also Krasny*, 607 F.2d at 844 ("Yet, we have always required a showing that the new evidence would 'probably' result in an acquittal upon a new trial."); *id.* at 845 n.3 (explaining that materiality and probability "are really two means of measuring the same thing"). As I discuss below, in addressing *Harrington*'s fifth requirement, I conclude that the newly discovered evidence of Swisher's fabrications makes it probable that a new trial will result in acquittal. Thus, I also conclude that the new evidence is material under *Harrington*.

The majority relies on evidentiary rulings made by the district court. It notes that the district court held that documents showing that Swisher lied about his military record were inadmissible under Federal Rule of Evidence 608(b). The majority further notes that the district court excluded the evidence under Rule 403. As discussed above, the district court's evidentiary ruling under Rule 608(b) was wrong as a matter of

law, and its ruling under Rule 403 was an abuse of discretion. The majority does not merely hold (erroneously) that the evidence was correctly excluded by the district court. It goes further, suggesting that because the district court properly excluded the impeaching documents from evidence under Rules 608(b) and 403, these documents could have no material effect on retrial. Even if this were true, this is irrelevant under *Harrington*. The materiality test under *Harrington* is not whether the newly discovered evidence — the Miller and Woodring affidavits — would have been admissible during Hinkson's first trial. The test is whether the newly discovered evidence would probably result in acquittal *on retrial*.

As I discuss in detail in part five of the *Harrington* test, I conclude that the Miller and Woodring affidavits would probably result in acquittal on retrial. The affidavits would not have to be admitted into evidence to have this effect. The government has now conceded that Swisher lied about his military record, that he did not engage in combat, that he did not earn the Purple Heart he wore on the witness stand, that he did not earn any of the other military records to which he claimed he was entitled, and that he brandished a forged "replacement DD-214" in front of the jury. Both sides now know the truth. If Swisher takes the stand and is asked about his military record, and if he is asked whether he lied under oath about that record at the first trial, the truth will necessarily come out. There are two alternatives. If Swisher tells the truth, the truth will come out through his testimony. If Swisher lies, the government will have a professional obligation to correct the record and to disown the testimony of its star witness.

### 4. Neither Cumulative nor Merely Impeaching

The fourth part of the *Harrington* test requires that the new evidence be "neither cumulative nor merely impeaching."

### a.  Cumulative

The district court concluded that "[t]he substance of both proffered documents is not new and is generally cumulative of previously available information." The "previously available information" to which the court referred consists of the documents that came to light at three different points during the trial: first, the Tolbert letter used by defense counsel to cross examine Swisher on January 14; second, the Dowling letter, which the prosecution gave to the court on the morning of January 21 and which the court also received later that day as part of Swisher's official military file; and third, the remainder of Swisher's official military file, which the court received on the afternoon of January 21.

During trial, the district court concluded that these documents established neither that Swisher's testimony was false nor that the "replacement DD-214" was fraudulent. On Monday, January 24, after reviewing Swisher's military file, including the Dowling letter, over the weekend, the court told counsel outside the presence of the jury that it found the file "very difficult to decipher," and stated that "the truth of the matter" was "not at all clear." The court told counsel that the documents in the file were "neither self-authenticating nor self-explanatory" and did "not conclusively decide the issue." The court concluded that it was "not at all convinced" that it had enough evidence to "resolve the question of whether or not the document that Mr. Swisher pulled out of his pocket is false or not."

The district court stated that it remained uncertain about the truthfulness of Swisher's testimony and the authenticity of the "replacement DD-214," despite the fact that Swisher's military file was a government record that the court itself had subpoenaed, and despite the fact that the file contained the Dowling letter. The Dowling letter, written by an officer in the Headquarters of the U.S. Marine Corps, stated in plain language that Swisher had not earned any personal military

commendations and that the "replacement DD-214" was a forgery. Another factfinder may have found this evidence sufficient to show that Swisher was a forger and a liar. But the district court was explicit in saying that it found that the evidence then before it was inconclusive.

The district court stated that "the only way" to resolve the uncertainty surrounding the "silent file" would be to hear from "a records custodian from the National Personnel Records Center or someone who is more familiar with military records and decorations than any of us." The prosecutor agreed with the court's assessment and added:

> What [the defense] would really have to prove, if this were to be resolved, is that . . . the substitute DD-214 signed by Captain Woodring, in, I believe, October '57 — that . . . the signature of Captain Woodring was forged; and I would suggest that probably would resolve whether it's correct or not.

> How you would prove that something that was signed in 1957 — I doubt very much Mr. Woodring is still with us, but I don't know.

Precisely the additional evidence the court said was lacking was supplied by Hinkson in his motion for a new trial in the form of an affidavit from Chief Warrant Officer Miller. Miller is the U.S. Marine Corps Liaison Officer to the National Personnel Records Center. His job is to "evaluate the authenticity of information, records and documents affecting individual Defense Department transfer documents including DD Forms 214." Miller concluded, after a thorough investigation, that the replacement DD-214 was a forgery and that Swisher had not earned a Purple Heart or any other personal commendation.

Similarly, precisely the additional evidence the prosecutor said was lacking was supplied in the form of an affidavit from

the now-retired Colonel Woodring. As it turned out, Colonel Woodring is (to use the prosecutor's words) "still with us." Colonel Woodring stated unequivocally in his affidavit that his signatures on both the purported 1957 letter to Swisher and the replacement DD-214 were forgeries.

In sum, the court stated at trial that the evidence before it was insufficient to allow it to determine the truth or falsity of Swisher's evidence. Defense counsel then presented to the court, in support of the motion for a new trial, precisely the additional evidence the court and the prosecutor said was needed to resolve the uncertainty. In this circumstance, this new evidence cannot possibly be considered cumulative.

The majority concludes that the Miller and Woodring affidavits are cumulative because "Hinkson's attorney had already proffered evidence that such 'Replacement DD-214' form was a forgery, in the form of the Tolbert and Dowling letters." Maj. Op. at 14983-84. The majority would be on firmer ground in so concluding if the district court had agreed with this statement. However, the district court was very clear in saying precisely the opposite of what the majority now says. As I have just explained, the district court concluded that Swisher's entire personnel file, including the Tolbert and Dowling letters, was insufficient to "establish that the replacement DD-214 was a forgery and that Swisher had lied about receiving military awards." Given the district court's view of the evidence then available, it is impossible to conclude that the Miller and Woodring affidavits are cumulative.

### b.    Merely Impeaching

Impeaching evidence may properly support a motion for a new trial under Rule 33. Indeed, we have expressly rejected the proposition that "impeachment evidence . . . is *never* sufficient to warrant a new trial under Fed. R. Crim. P. 33." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) (emphasis in original); *see also United States v. Wallach*, 935 F.2d 445

(2d Cir. 1991), *as amended* (concluding that new evidence impeaching the government's central witness was sufficiently powerful to require a new trial); *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) (explaining that the prohibition on using impeachment evidence to secure a new trial should not be "taken at face value"); *Balestreri v. United States*, 224 F.2d 915, 917 (9th Cir. 1955) ("To deny in every case a motion for a new trial on the ground of newly discovered evidence for the sole reason that the evidence was 'merely impeachment' might often lead to injustice.").

We recognized in *Davis* that enforcing a per se prohibition on impeachment evidence as the basis for a new trial would be inconsistent with the spirit of Rule 33, which "permits the granting of a new trial motion 'if required in the interest of justice.' " *Davis*, 960 F.2d at 825. A per se prohibition would also be inconsistent with our longstanding refusal to draw a "categorical distinction between types of evidence." *Taglia*, 922 F.2d at 415; *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (refusing to distinguish between exculpatory and impeachment evidence in the *Brady* context); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (refusing to distinguish between exculpatory and impeachment evidence in cases involving prosecutorial misconduct). Accordingly, we recognized in *Davis* that sometimes,

> newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be 'material' under [the *Harrington* test].

960 F.2d at 825; *see also Taglia*, 922 F.2d at 415 (holding that a new trial would be warranted under Rule 33 if it were discovered after trial that the government's star witness was

"utterly unworthy of being believed because he had lied consistently in a string of previous cases"); 3 Wright et al., *supra*, § 557, at 560, 563 (noting that impeachment evidence is usually "not sufficient to justify a new trial," but that this is not an "invariable rule," and "in flagrant cases it may suffice").

In denying Hinkson's motion for a new trial, the district court wrote that "the proffered evidence [*i.e.*, the Miller and Woodring affidavits] is impeachment evidence and so is not a valid basis for a new trial." It is apparent from this statement that the district court believed mistakenly that, as a matter of law, impeachment evidence may never provide the basis for a new trial. As just discussed, our cases do not so hold.

The majority concludes that the Miller and Woodring affidavits are impeaching and therefore cannot satisfy the fourth requirement of *Harrington*. It writes, "[E]videntiary admission of the extrinsic Miller and Woodring affidavits would serve no purpose other than to impeach Swisher's testimony as to his military record rather than his testimony as to Hinkson's solicitations." Maj. Op. at 14984. The majority mistakes the nature of the Miller and Woodring affidavits. They are powerful enough to permit a jury to conclude that Swisher's testimony inculpating Hinkson — the only uncorroborated testimony implicating Hinkson on the three counts for which the jury convicted him — was "totally incredible."

### 5.    Probability of Acquittal on Retrial

The fifth *Harrington* requirement is that "the new evidence must indicate that a new trial probably would result in acquittal." I conclude that this new evidence would probably result in acquittal at retrial. I so conclude after comparing the evidence presented at trial on the three solicitation counts on which Hinkson was acquitted, and the three counts on which he was convicted.

I apologize for the length of the discussion that follows, but it is unavoidable. A judge who is asked to decide whether "a

new trial probably would result in acquittal" necessarily must examine carefully the evidence that was presented in the first trial, and, as a corollary, the evidence that is likely to be presented in the second trial. A judge ruling on a new trial motion may choose not to describe that evidence in detail, but he or she must necessarily consider it. Given the nature and importance of this case, I describe it in detail so that the reader may understand the basis for my conclusion.

Three solicitations to murder were charged in Counts 1 through 3 of the indictment. In these counts, the government charged that Hinkson had solicited James Harding "in or about January 2003" to murder Cook (Count 1), Hines (Count 2), and Lodge (Count 3). The jury acquitted Hinkson on all three of these counts.

Three more solicitations were charged in Counts 4 through 6. In these counts, the government charged that Hinkson had solicited James Harding "on or about March 17, 2003" to murder Cook (Count 4), Hines (Count 5), and Lodge (Count 6). The jury deadlocked on these three counts.

Three more solicitations were charged in Counts 7 through 9. In these counts, the government charged that Hinkson had solicited Swisher "between about December 2002 and February 2003" to murder Cook (Count 7), Hines (Count 8), and Lodge (Count 9). The jury returned a verdict of guilty on these counts.

Finally, two threats to commit murder were charged in Counts 10 and 11. In these counts, the government charged that Hinkson made statements to Anne Bates in which he threatened to murder the children of Cook (Count 10) and the children of Hines (Count 11). The jury acquitted Hinkson on these counts.

The issue at trial was not whether Hinkson asked Harding and Swisher to kill Cook, Hines, and Lodge. The evidence

was persuasive that he had done so. The issue was whether Hinkson had been serious in his requests. That is, the issue was whether he had an actual "intent" that Cook, Hines, and Lodge be killed, which was required under 18 U.S.C. § 373(a). Only if Hinkson was serious in soliciting the murder of Cook, Hines, and Lodge — that is, only if he had an actual intent that they be killed — did he commit a criminal offense.

The jury acquitted Hinkson outright on three of the nine counts charging solicitation in violation of § 373(a). On these three counts, the jury concluded that the government had not shown that Hinkson had been serious in soliciting murder on that occasion. The jury could not make up its mind on three more of the counts, unable to conclude unanimously that Hinkson had been serious in soliciting murder on that occasion. The jury was able to conclude unanimously only on three counts — Counts 7-9, the counts involving Swisher — that Hinkson had been serious in soliciting murder. To assess the likelihood of an acquittal on retrial on the three Swisher-related counts (Counts 7-9), I compare the evidence on the three Harding-related counts (Counts 1-3) on which Hinkson was granted an outright acquittal.

More than half of the trial testimony provided background evidence for all of the counts charged in the indictment. This background evidence showed that Hinkson owned and operated a lucrative business called WaterOz in Grangeville, a small town in Idaho. WaterOz bottled water into which had been dissolved, by a secret process supposedly invented by Hinkson, very small particles of minerals such as gold and platinum. According to Hinkson, the water has marvelous medicinal properties. Hinkson advertised and sold his magic water over the Internet.

Hinkson did not pay federal income tax, on the asserted ground that he was not legally obligated to do so. (In a separate appeal, our three-judge panel affirmed Hinkson's criminal conviction on his tax and currency structuring offenses.)

Hinkson was unstable and paranoid. He was continually worried that people, including government officials and his own employees, were trying to take WaterOz from him. After Cook and Hines participated in an early-morning raid of his home in November 2002, Hinkson repeatedly claimed that they had tried to murder him. Hinkson also repeatedly claimed that an attorney named Dennis Albers, who previously had represented a plaintiff in a successful suit against him, was trying to murder him.

Hinkson developed grudges easily and held them tenaciously. He had a special dislike for employees of the federal government. Sometimes his talk was somewhat comical. For example, he talked to James Harding about a "fed-a-pult" and a "fed-guard." According to Harding, a "fed-a-pult" was a device to catapult federal agents into a canyon or into an oncoming train. A "fed-guard" was something to put "on the front of your car like a cattle guard." Sometimes his talk was not comical at all. For example, the evidence at trial showed that Hinkson asked multiple people, on multiple occasions, to kill Cook, Hines, and Lodge, and that Hinkson repeatedly said he wanted to torture and kill people, including Cook's and Hines's children.

### a. Evidence Supporting Counts 1-3

Counts 1 through 3 charged that in January 2003 Hinkson solicited James Harding to kill Cook, Hines, and Lodge. As noted above, the jury acquitted Hinkson on these counts.

The evidence supporting Counts 1 through 3 was as follows. In November or December 2002, Harding and Anne Bates met Hinkson at a "health forum" in Southern California. At that time, Harding was a restaurant manager in Southern California. Previously Harding had been a bodyguard and had worked "in the entertainment field." He had most recently "hosted" radio shows on "the paranormal"; before that his radio work had been "comedy shows, morning shows, after-

noon drive, entertainment." His last radio work was three years before he testified.

After the "health forum," Hinkson, Harding, Bates, and several others went out to eat. During the meal, Hinkson offered Bates a job at WaterOz. Harding and Bates drove to Grangeville at the beginning of January 2003 and stayed at Hinkson's house.

On the second night of Harding and Bates's stay, Harding was sitting at the kitchen table. Bates was nearby. Harding testified that Hinkson handed him "a large sum of money." Harding responded with a crude joke: "Who do I have to blow?" According to Harding, Hinkson responded "something like, 'It's not who you have to blow but who you have to kill.' " Harding testified, "I could make this much money killing [Cook, Hines, and Lodge]. He had also a wad with him of some sort; and that was supposed to be another $10,000. There was a $10,000 flat fee, and this was a wad of $10,000." Harding testified that Hinkson then "pulled back . . . and it became a joke." But, Harding testified, "I assumed that I was being tested." He testified further, "And when the $10,000 came up, I thought this was his test."

Bates, who was also in the kitchen, testified about the episode.

> We were at the table in the kitchen . . . . He was saying something along the lines that he would like some of these people dead, and he had a lot of money that he produced from somewhere. And I don't know if — maybe in a joking manner, he offered it to J.C. [*i.e.*, Harding] and said, you know, "Whoever does this, this is theirs," something along those lines from what I can remember.

The prosecutor asked: "Did he say it was a joke?" She answered, "He did not say it was a joke, no."

Bates remained in Hinkson's house in Grangeville, but Harding went back to Southern California to bring Bates's things back in a U-Haul truck. On Harding's return he again stayed in Hinkson's house, "probably" during the second week of January. Harding testified as follows:

> Q. Did you have any further discussions with Mr. Hinkson where he talked about these three feds, federal officials?
>
> A. Every time I talked to Dave. That was on his mind every time when we talked on every occasion.
>
> Q. Did that happen on the second occasion?
>
> A. Absolutely, yes.
>
> . . .
>
> Q. What did he say?
>
> A. That they need to die; they are demons; they need to be tortured. It was sick stuff that I don't like coming out of my mouth. . . . I hate them; they are demons; they need to die; they need to be killed; I have got people working on that. You never know if he is kidding or serious. I want their throats cut; I want them tortured; I want them taken out and shot in the knee caps and told who is having it done and why it's being done.
>
> . . .
>
> Q. Did he say how he wanted Agent Hines killed or harmed?
>
> . . .

A. No. The second visit . . . it wasn't specific. It was just malicious rhetoric, like I'm saying. He would be killed, executed. Dave becomes a madman when he talks about it. He will, literally, get very angry. It's anything you can think of that is wild. It grew and grew each time.

During this second visit, Hinkson asked Harding to get ammunition for guns that Hinkson kept in the house. Harding testified that Hinkson did not seem to know much about guns, and that he was very interested in what Harding knew about them: "[W]e talked about my knowledge of guns and that I grew up around guns and shotguns. He wanted to know how extensive my background was, the basics of how I got into it and why I was into it." Harding testified that he had worked as a bodyguard, and that Hinkson knew him through a friend who was also a bodyguard:

Q. How do you know he knew you through another bodyguard?

A. They were good friends. They were close friends.

Q. Who is that?

A. Mark Glover . . . . Him and David — I don't know how — are very close friends. And I know Mark through doing security work, bodyguarding.

. . .

Q. Have you worked as a bodyguard?

A. Yes.

Q. Have you worked with Mr. Glover?

A. Yes.

Harding became very friendly with Hinkson and frequently stayed at his house in Grangeville on the weekends. During those visits, Hinkson repeatedly discussed killing Cook, Hines, and Lodge.

> Q. On the occasions that you go back up to Grangeville, would you see Mr. Hinkson?
>
> A. Yes.
>
> Q. Would you talk to him on the same subject matters of the three federal officers?
>
> A. Extensively.
>
> Q. Did he mention these things about killing federal officers more than once?
>
> A. Every time we spoke, yes.
>
> Q. How many times?
>
> A. Fifty. . . .
>
> Q. Did there come a time when he also offered you money?
>
> A. Yes.
>
> Q. In relationship to when you first came to Grangeville, that first trip in early January, when would be the second time he offered you money?
>
> A. A couple of weeks, maybe.

The second time Hinkson offered Harding money, the two men were driving to the bank. Harding testified that Hinkson had $10,000 with him.

Q. What did he say . . . ?

A. Just leading. You could use the cash. Do you need cash? Do you need money. You could use this extra money. Think about it. I never knew if he was serious or kidding. He always talked about it and said it; and it was always leading, like I was supposed to bite.

Harding eventually became convinced that Hinkson had been serious in soliciting him to kill Cook, Hines, and Lodge. When Hinkson solicited him again in March of 2003, Harding contacted the F.B.I. He spoke to Nancy Cook, telling her, "Somebody is going to make an attempt on your life, I believe, if I don't make this phone call." The F.B.I. arranged for Harding to go back to Hinkson's house with a recording device concealed on his body. Possibly because Hinkson suspected the existence of the device, Hinkson said nothing incriminating on that occasion.

       b.    Evidence Supporting Counts 7 through 9

Counts 7 through 9 charged that between December 2002 and February 2003, Hinkson solicited Swisher to kill Cook, Hines, and Lodge. As noted above, the jury convicted Hinkson on these counts.

I have already described much of the evidence supporting Counts 7 through 9. I recount it here in more detail to facilitate a meaningful comparison to the evidence supporting Counts 1 through 3. Swisher took the stand wearing a Purple Heart pin on his lapel. On direct, he was folksy and garrulous:

Q. Mr. Swisher, how old of a man are you?

A. I turned 68 yesterday.

Q. You live in Idaho?

A. Yes, I do.

Q. For how long?

A. My gosh. Over thirty years.

. . .

Q. How did you have an interest in mining?

A. Well, I have an old friend, who is now dead — bless his soul — and he was one of the — he was the epitome of an Idaho range rider till the day he died. He carried an old, single-action Colt .45 and rode the range in the back country.

Q. My question is: How did you manage to switch careers [to mining]?

A. I'm getting to that, counselor.

Swisher testified that he had expertise in "assaying," and testified at some length about his work for WaterOz testing the concentration of minerals dissolved in the water. Then the prosecutor asked him about his military background, and Hinkson's interest in that background:

Q. Have you ever served in the Armed Forces, Mr. Swisher?

A. Yes.

Q. Did Mr. Hinkson ever ask you about your service in the Armed Forces?

A. Yes.

Q. What branch did you serve in?

A. United States Marine Corps.

Q. Did you ever discuss that with Mr. Hinkson?

A. Yes.

Q. And what was the nature of your discussion with him?

A. As I recall, Mr. Hinkson stated he had been in the Navy. I indicated I had been in the Marine Corps. He asked if I had served in any combat situations. I . . . told him, "Yes."

Q. What else did he ask you about combat situations?

A. He asked if I had ever killed anyone.

Q. What did you say?

A. I told him, "Yes." He asked, "How many?" And I told him, "Too many."

Q. Was that one conversation or several?

A. It may have happened over a period of time.

Q. What period of time?

A. Oh, probably off and on throughout the year 2001.

Swisher testified that Hinkson knew that he was an expert with firearms:

Q. Did you ever claim to Mr. Hinkson that you had proficiency with firearms?

A. I believe he knew that I was an expert rifleman, pistolman.

Q. How did he know that?

. . .

A. I probably told him, and he observed my shooting.

Q. What was the occasion that you went shooting with him?

A. I believe it was probably in December, sometime in December of 2002, that he had a gentleman from . . . Ukraine, visiting. . . . He said we were going to meet out at an employee's who lived in the country, Mr. Rich Bellon. . . . [W]e shot during the course of the day.

Q. Who did?

A. Myself, Mr. Hinkson, and the Russian gentleman.

. . .

Q. What did you bring?

A. I brought a .22 Henry lever-action rifle and .32 semi-automatic Browning pistol, and a .45 auto.

Q. How was your shooting?

A. I always hit what I aim at.

Q. How was Mr. Hinkson's shooting?

A. Not terribly good.

Q. What were you shooting at?

A. Well, we shot some trap with a shotgun. I only shot maybe a half dozen times because I recently had a pacemaker installed; and a shotgun, a twelve-gauge particularly, kind of jars you around a little. I decided I would quit in due time, but I hit my targets. As I recall, I don't believe David hit any of his.

Swisher described their "trap shooting" as follows:

The person who wasn't shooting would throw the clay pigeons for the others. You have a spring-loaded hand unit that will kick them out, I expect, thirty, forty yards without any problem at all, airborne. . . . And the challenge is to hit the airborne target when it's across from you.

Swisher testified that Hinkson was very angry at Dennis Albers, whom Swisher also disliked. Swisher testified that sometime shortly after April 2002 Hinkson told him "in private" that he wanted Albers and his family members tortured and killed:

Q. What was it that Mr. Hinkson said?

A. Well, he started off by talking about how he would like to have Mr. Albers and his family, particularly his wife, Margaret, tortured and killed. And he went into quite a description of the torture.

Q. And what was that?

A. He would — he said he would like to see them stripped, bound, and gagged, and then burned with cigarettes or cigars. And then while Albers was down on his knees observing this occurring to his wife and any other family members that might be

present, he wanted to have a plastic bag put over her head so that she would suffocate to death in front of him, along with the other family members. Then he wanted that procedure repeated on Mr. Albers, himself.

Q. Did he want you to do something in that regard?

A. When he finished describing what he wanted done, then he offered me $10,000 a head to do it.

Q. What was his demeanor like when he was telling you these things?

A. He was cool and calm at that time.

Q. What was your response to Mr. Hinkson?

A. I told him he was out of his mind and he needed to knock that kind of BS off, and I didn't even think about it.

Q. How did he respond to that?

A. He just smiled and then didn't reply and changed the subject.

Swisher testified that he had a further conversation "in Hinkson's trailer" in July or August of 2002:

Q. What did Mr. Hinkson say about how he felt about Nancy Cook and Steve Hines?

A. He wanted them treated in the same fashion as he had initially described for Mr. Albers and his family . . . . [H]e asked if I remembered the offer he made regarding Mr. Albers and his family. And I said that, of course, I did. And he said he wanted that done,

basically, with Ms. Cook and her family and Mr. Hines and his family. And I told him, again, that he was out of his mind. And I, also, went into a little bit of a dissertation because David was a friend at that time. And he said, "Well, you know, I know you're used to it. I mean, you have killed people." I said, "Yes, I have killed people in defense of my life and others; but what you are talking about is murder, and there is a significant difference here. And you need to get it out of your head because, if you continue talking that way, it will get you in trouble. And if you continue talking this way and I think you are serious about this, I will have to report it to the authorities."

Q. How did he respond to that?

A. Well, he got his smile again; and then he changed the subject.

Swisher testified that after Cook and Hines arrested Hinkson in a raid on his house in November 2002, his hostility toward them intensified. Swisher testified, further, that Hinkson had a third conversation in which Judge Lodge was added to the list of intended victims:

A. [I]n January of '03, he approached me again[,] went through the names of the people that had offended him, and added a federal judge by the name of Lodge to that list. And I, essentially, dropped the hammer at that point on David.

Q. Let me first ask what he asked you to do regarding those people?

A. He wanted them all treated the way that the initial offer regarding Albers and his family had been handled.

Q. Were you to receive anything in return for doing that?

A. At least $10,000 a head. And I made a mental note that, with all of the people he named at that time, we were well over $100,000.

. . .

Q. Did the $10,000 offer include Nancy Cook and Steve Hines?

A. Oh, yes.

Q. Did it include Mr. Albers?

A. Yes.

Q. Did it include the children of those people?

A. Yes.

Q. What did he want done with the children of those people?

A. Treated in the same fashion.

Q. How?

A. Tortured and killed.

Q. Now, you mentioned, this time, you reacted in a different fashion?

A. Yes, I did. I'm afraid I became a bit hostile, myself, at that point in time.

Q. What did you say?

. . .

A. I told him, regarding these matters of trying to kill people or having me murder them for him and so on, that I never wanted to hear that again and to fuck off. And he left.

Q. What was his demeanor like when he was asking you to do this?

A. He was almost in a pleading fashion that last time. He was telling me how harassed he had been and how they had hurt him and they were out to not just get him but to kill him, too, and he just had to have this done; and as his best friend, as he put it at that time, he felt I should do it.

Swisher testified that sometime in the spring or summer of 2003, he finally contacted a law enforcement official. However, he was unsure about the date on which he did so, and he was unforthcoming about the details of what he told law enforcement officials:

Q. When did you contact anyone in legal authority regarding Mr. Hinkson?

A. Oh, I think it was probably just before he was re-arrested in '03. I'm not quite sure of the date there.

Q. Are you talking about spring or summer '03 or what?

A. No. It would have probably been getting close to summer there. Spring, summer, somewhere through there. Sometime after April, I'm thinking.

Q. All right.

A. I might be wrong.

Q. And who did you contact?

A. I contacted the Idaho County Assistant Prosecutor from Grangeville.

Q. Now, is he a State Prosecutor, as opposed to a Federal Prosecutor?

A. Yes. That's correct.

Q. And did you express some concern to him?

A. I did.

Q. Was it regarding Mr. Hinkson?

A. Yes.

Q. Thereafter, were you contacted by the FBI?

A. Yes.

Q. Who contacted you?

A. Mr. Will Long.

Q. That's the person here at the table?

A. Correct, sitting right there.

THE COURT: For the record, the witness has identified Special Agent Long.

[THE PROSECUTOR]: Thank you, Your Honor. I have no further questions on direct, Your Honor.

The government's direct examination of Swisher filled forty-three pages of transcript. Cross examination, not including Swisher's testimony about the Purple Heart and the "replacement DD-214," filled eighty-three pages. During this cross examination, Swisher made clear that on each of the three occasions when Hinkson solicited him to kill Albers, Cook, Hines, and Lodge, there were no witnesses. Swisher stated plainly: "When he made the three direct solicitations to me, they were made in private."

Much of the cross examination was devoted to showing the extreme hostility between Swisher and Hinkson. This hostility had arisen after Hinkson's supposed solicitations of Swisher to commit murder, for reasons unrelated to the solicitations. Richard Bellon was one of Hinkson's key employees at WaterOz; indeed, the trap shooting had taken place at Bellon's house. Sometime in late 2003, Bellon sued Hinkson. In response, Hinkson brought Swisher into the suit, apparently as a third-party defendant. Swisher then counterclaimed against Hinkson for more than $500,000.

Relations between Swisher and Hinkson became so strained that Swisher accused Hinkson of hiring someone to kill him. Swisher testified that he was "at a remote area in Idaho County with a Vietnam combat veteran friend." Swisher said that he was sitting in an outhouse when, according to his testimony, someone hired by Hinkson shot at him and missed. However, Swisher admitted that he never saw the person who supposedly did the shooting, and that no shell casings or footprints were ever found.

Only one witness corroborated Swisher's testimony that Hinkson had been interested in, and impressed by, Swisher's military background. That witness was Richard Bellon. Bellon testified that Hinkson "wanted to hire Joe Swisher as a bodyguard." "[H]e felt like he needed to hire [Swisher] because he was trained":

Q. Did [Hinkson] explain to you how Mr. Swisher was trained?

A. Yes. . . . [I]t was that Mr. Swisher had an extensive military background, that he had been in combat, and that he had killed people during the war. Mr. Hinkson would tell me about that and the details of him, his past.

In his own testimony, Swisher never mentioned that Hinkson had wanted to hire him as a bodyguard. Nor did Swisher ever mention that Hinkson had been interested in his military background because of a desire to hire a bodyguard.

Hinkson took the stand in his own defense. Swisher had already testified that on three occasions Hinkson had solicited him "in private" to commit murder. Hinkson specifically denied having made such solicitations:

Q. Mr. Hinkson, Mr. Swisher indicated that he had been solicited by you on a number of occasions . . . . Do you recall that he said that in his testimony?

A. . . . Yeah.

Q. Mr. Hinkson, did you ever have a communication with Mr. Swisher where you asked him to murder anyone?

A. No, sir.

Hinkson had a somewhat different recollection of the excursion to Bellon's house. According to Swisher, they had engaged in trap shooting "during the course of the day." Swisher testified, "I hit my targets." Hinkson testified:

Q. Do you remember the evening that Mr. Swisher went to Mr. Bellon's house with you for dinner?

A. Yes, I do.

Q. And I believe there was testimony that that occurred in approximately September of '02?

A. Yes, just before his open heart surgery.

. . .

Q. And there was someone who came to dinner that night? Who was that?

A. Roman Polankio from the Ukraine.

. . .

Q. Who fired the gun that evening?

A. I'm not really interested in guns, and I shot it twice. Mostly, Joe [Swisher] shot from his chair because he had a hard time standing. He was pretty sick.

Bellon, at whose home the trap shooting took place, was called by the government to testify. The government did not ask Bellon whether it was true that Swisher was then "pretty sick" with heart disease; that Swisher shot "mostly . . . from his chair"; or that Swisher, though ill and sitting in a chair, successfully hit all of his targets. Those targets, according to Swisher's testimony, had been rapidly moving airborne clay pigeons thirty to forty yards away.

      c.   Comparison of the Evidence in Counts 1 through 3 and Counts 7 through 9

The background evidence against Hinkson was the same for both Counts 1 through 3 (the Harding-related counts on which he was acquitted) and Counts 7 through 9 (the Swisher-

related counts on which he was convicted). It was relevant to all of these counts that Hinkson had a paranoid unstable personality; that he disliked government interference with his affairs; that he particularly disliked Cook, Hines, and Lodge; and that he had asked multiple people on multiple occasions, not limited to Harding and Swisher, to kill Cook, Hines, and Lodge on his behalf.

The evidence specific to Counts 1 through 3 and Counts 7 through 9 is similar in a number of respects. First, there was evidence that Hinkson believed that both Harding and Swisher were skilled in the use of firearms. Second, there was evidence that Hinkson knew that Harding had been a bodyguard, and that he was interested in using Swisher as a bodyguard. Indeed, Bellon testified that Hinkson's interest in Swisher's military background and skill in firearms stemmed from his interest in using Swisher as a bodyguard. Third, the charged solicitations took place at about the same time. Counts 1 through 3 charged conduct that supposedly took place in January 2003. Counts 7 through 9 charged conduct that supposedly took place between December 2002 and February 2003.

The evidence specific to these counts differed in some respects. However, three of those differences made it more likely that the jury would have convicted on the Harding-related counts rather than on the Swisher-related counts.

First, there was a corroborating witness to one of the charged solicitations of Harding. Bates was a witness to the solicitation in Hinkson's kitchen at the beginning of January. She testified that she saw the "wad" of money on the kitchen table and that she heard Hinkson tell Harding that the money was his if he killed Cook, Hines, and Lodge. Bates testified that Hinkson had not said that he was joking when he said this. By contrast, Swisher testified that there were no witnesses to any of Hinkson's three solicitations. He specifically testified that all three solicitations took place "in private."

Second, Harding and Hinkson were good friends at the time of the solicitations. They became unfriendly only as a result of Harding's reporting to the F.B.I. that Hinkson had solicited him to commit murder. Swisher and Hinkson also had been good friends at the time of the solicitations. But, by contrast to Harding, Swisher had become a bitter enemy, for reasons unrelated to the solicitations, by the time of trial. Thus, unlike Harding, Swisher had ample reason, unrelated to the solicitations, to wish Hinkson ill when he testified at trial.

Third, Harding testified that Hinkson first solicited him in January 2003 to murder Cook, Hines, and Lodge. He testified that Hinkson solicited him again in March 2003. Immediately after the March solicitation, Harding contacted the F.B.I. In an effort to help the F.B.I., Harding went so far as to wear a secret recording device in an attempt to obtain incriminating evidence against Hinkson. By contrast, Swisher testified that Hinkson solicited him shortly after April 2002 to murder Albers. Swisher testified further that Hinkson solicited him in July or August 2002 to murder Cook and Hines. Finally, Swisher testified that Hinkson solicited him in November 2002 to murder Cook, Hines, and Lodge. Swisher testified that he did not go to a local Idaho prosecutor to report Hinkson's solicitations until sometime after April 2003.

Harding was so concerned about Hinkson that he went to the F.B.I. within two months of the time Hinkson first solicited him, and immediately after the second time. When Harding contacted the F.B.I., he and Hinkson were still on good terms. Harding testified that he spoke directly to Nancy Cook, one of Hinkson's would-be victims, and told her that he thought she was in danger. Harding then wore a wire at the request of the F.B.I. in an attempt to obtain evidence against someone he clearly thought was dangerous. By contrast, Swisher waited at least a year after Hinkson solicited him to murder Albers, at least nine or ten months after Hinkson solicited him to murder Cook and Hines, and at least three or four months after Hinkson solicited him to murder Cook,

Hines, and Lodge before reporting Hinkson to law enforcement officials. Unlike Harding, Swisher called a local Idaho prosecutor rather than the F.B.I., even though federal officers had been threatened, and, unlike Harding, Swisher gave no specifics about what he told law enforcement officials. When Swisher finally contacted the local prosecutor, he and Hinkson were no longer on good terms. There is nothing in the record to indicate that Swisher ever offered to wear a wire or otherwise to help gather incriminating evidence against Hinkson.

In three respects the evidence against Hinkson at trial was stronger in the Swisher-related counts than in the Harding-related counts.

First, Swisher testified that Hinkson believed him to be particularly well qualified to be a killer. Swisher testified that he told Hinkson about his combat experience in Korea, and that he had killed "too many" people. We now know that Swisher was never in combat in Korea and that he never killed anyone, let alone "too many" people. However, there is evidence from both Swisher and Bellon that Hinkson believed the story. Swisher's (falsely claimed) combat experience could well have made a greater impression on Hinkson than Harding's experience with firearms and his work as a bodyguard. There was a great deal of evidence at trial — most of it from Swisher himself — about Swisher's ill-health. But the jury could have concluded that despite Swisher's ill-health, Hinkson could have seen him as a well qualified killer.

Swisher further testified that while trap shooting he had demonstrated to Hinkson that he was an excellent shot. The jury might have had some reason to doubt Swisher's testimony that he hit all of his targets, given that Hinkson described Swisher as a very sick man who sat in a chair while shooting. But the jury could well have disbelieved Hinkson, and could have believed that Swisher had indeed demonstrated to Hinkson on that occasion that he was an excellent

shot. The jury could have concluded that an actual demonstration of shooting prowess by Swisher was more impressive to Hinkson than Harding's mere talk about his knowledge of guns.

Second, Swisher testified that during the first solicitation Hinkson's "demeanor" had been "calm and cool," and that during the third solicitation Hinkson's "demeanor" was "almost in a pleading fashion." By contrast, Harding testified that he had difficulty telling whether Hinkson was serious in soliciting the murders. Only after a second solicitation in March did Harding decide that Hinkson had been serious.

Third, Swisher presented himself as a United States Marine who had been wounded in the service of his country. His status as a decorated war hero may have been, for some or all of the jurors, an additional reason to believe his testimony. The jury may have found Swisher particularly credible and sympathetic when, after an accusation by Hinkson's counsel that Swisher was lying about his military record, Swisher dramatically produced his "replacement DD-214" from his pocket. The jury might also, despite the district court's instruction, have penalized the defense for what appeared to be an unfounded attack on a decorated war hero.

Our task is not to replay the first trial except as it might help us predict what would happen if Hinkson is retried on Counts 7 through 9. The question before us is what would happen at a new trial. Specifically, the question is whether the fifth *Harrington* requirement is satisfied: Does the new evidence "indicate that a new trial would probably result in acquittal"?

In the original trial, Swisher was the only witness to provide direct evidence that Hinkson solicited him to commit the killings. On retrial, the government would have no choice but to rely on Swisher to supply the evidence of Hinkson's solici-

tations. To say that Swisher's credibility would fare poorly at a new trial is an understatement.

At Hinkson's original trial, the jurors almost certainly had the impression that Swisher was a decorated combat veteran. The prosecutor described Swisher in his opening statement as a "Combat Veteran from Korea during the Korean Conflict" who "was not averse to . . . violent, dangerous activity," and stated in his closing argument that Hinkson "understood" that Swisher "had served in combat and killed people." In response to defense counsel's questions, Swisher produced his "replacement DD-214" on the witness stand and testified that he had seen combat in Korea and earned a Purple Heart. Defense counsel asked the district court to instruct the jury to disregard that testimony because he feared that the jury might penalize the defense for wrongly assailing a war hero. Although the court granted defense counsel's request, the court's instruction to the jury referred to Swisher's lapel pin as a "Purple Heart Medal" and a "military commendation."

Defense counsel's efforts to impeach Swisher at the original trial focused on the fact that Swisher and Hinkson, who were once friends, were now bitter enemies who had sued and counter-sued each other. On retrial, impeachment of Swisher would not be so limited. The parties now know conclusively, based on the Miller and Woodring affidavits, that Swisher forged his "replacement DD-214" and his purported "supporting letter" from Colonel Woodring, and that he used these forged documents in an effort to obtain veterans' benefits. The parties also now know conclusively that Swisher never served in combat or earned any personal military commendations, and that he was not injured in battle overseas but in a private automobile accident near Port Townsend, Washington. And they now know conclusively that Swisher lied under oath during the first trial about participating in secret combat missions in North Korea, about being wounded in action, and about receiving a Purple Heart.

At a new trial, the government could put Swisher on the stand to testify, as he did at the original trial, that he told Hinkson that he was a decorated Korean War veteran who had killed "too many" people. The government could then argue that Hinkson, believing these things, seriously solicited Swisher to kill three government officials. But this time, on retrial, defense counsel and the government would know the truth.

Defense counsel would impeach Swisher by asking if it was true that he was not in fact a Korean War veteran; that he had in fact not won a Purple Heart or other awards; that he had not in fact been injured in combat in Korea but rather in a private automobile accident; and that in fact he had lied to the Idaho Division of Veterans Services about his injuries and non-existent medals in an attempt to get military benefits to which he was not entitled. That would already be bad enough, but it would get worse.

Defense counsel would also ask Swisher whether, the last time he appeared in court to testify under oath against Hinkson, he wore a Purple Heart lapel pin to which he was not entitled, presented a forged "replacement DD-214," and lied about his military record. This time, defense counsel would not be left defenseless if Swisher were to choose to lie in response to these questions because this time the government would also know the truth. If Swisher were to lie in response to any of the questions, the government would be obligated to correct the record. *See Napue*, 360 U.S. at 269; *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).

In short, a new trial would be a disaster for the government. A new jury would not only learn, as the first jury did, that Swisher and Hinkson, once friends, had become bitter enemies by the time Swisher testified. It would also learn, as the first jury did not, that Swisher had no compunction about lying under oath to serve his ends, and that he had lied under oath and produced forged documents at Hinkson's first trial.

I therefore conclude, under the fifth part of the *Harrington* test, that a new trial would probably result in acquittal.

### 6.  Summary

Because Hinkson's motion met all five requirements of the *Harrington* test, I would hold that he is entitled to a new trial on the Swisher-related counts of soliciting murder.

### Conclusion

The district court committed two errors, either of which was sufficient to reverse its decision and grant Hinkson a new trial. I would reverse the district court's denial of Hinkson's motion for a new trial because the district court erroneously precluded Hinkson from introducing documents into evidence to show that Swisher lied about his military record and forged his "replacement DD-214." I would also reverse the district court's denial of the motion for a new trial because the newly discovered evidence produced in support of the motion satisfies the five-part *Harrington* test.